JOHNSON COUNTY SAVINGS BANK v. MARGERY CARROLL, Appellant.

Homestead: PROVING SAME. A wife, claiming property as a homestead on the ground that the proceeds of a former homestead were used in paying for it must clearly show that such is the case.

TITLE BY CONTRACT. A homestead right does not depend on a fee simple title, but may attach to property held under a contract for a deed.

CREATION OF: *As against debt.* Under a contract for the purchase of property, the vendee was not entitled to possession until final payment. In the vendor's absence, with the consent of his wife, who conducted the sale, the vendee took possession two days prior to final payment. *Held*, that the provision as to possession was waived and hence the vendee's homestead attached immediately on his taking possession.

ON REHEARING.

EXEMPTION OF: *Borrowed money used in payments on.* Where it was no part of the contract between the parties that borrowed money used to pay for a homestead should be so used, but the loan was made on other security, the creditor is not entitled to a lien on the homestead.

EQUITABLE LIENS. The fact that a creditor has lost the security which he relied on when he loaned money which was used to pay part of the purchase price of a homestead does not entitle him to a lien on the homestead.

SAME.  Under Code, Section 2972, providing that the homestead is
exempt from judical sale, where there is no special declaration of
the statute to the contrary, an indebtedness incurred after the
6 homestead right attaches, though for money paid on the price,
confers on the creditor no right to a lien on the homestead, there
being no special declaration of the statute making the homestead
liable in such a case.

ROBINSON, C. J , dissenting.

LADD, J., concurring specially.

GRANGER, J., not sitting.


*Appeal from Johnson District Court.*—HON. M. J. WADE,
Judge.


WEDNESDAY, FEBRUARY 1, 1899.


ACTION commenced at law against Moreau Carroll,
aided by attachment, to recover the amount due on a prom-
issory note.  The writ of attachment was levied upon prem-
ises in Iowa City which were occupied by the family of
Carroll as a home.  Notice of the action and of the issuing
of the attachment was served on Carroll. by publication.
He failed to appear, default was entered against him, and
judgment was rendered in favor of the plaintiff for four
thousand twenty-six dollars and sixteen cents, attorney's
fees, and costs, and an order was made for the sale of the
attached property.  Margery Carroll, wife of the defendant,
intervened, and claimed that the attached property belonged
to her, and that it was exempt from seizure to pay the judg-
ment rendered against the defendant, because it was the
family homestead.  In reply to the answer to her petition,
she pleaded facts which she claims estop the plaintiff to
enforce its judgment against the property.  The cause, so
far as related to the intervention proceedings, was trans-
ferred to the equity docket, and tried as in equity, and a
decree was rendered subjecting the attached premises to
the payment of a portion of the judgment.  The intervener
appeals.—*Reversed.*

*Remley, Ney & Remley* for appellant.

*Joe A. Edwards* for appellee.

WATERMAN, J.—The facts material to an understanding of this case, admitted by the parties or established by the evidence, are substantially as follows: In the year 1869 Moreau Carroll married the intervener. At that time she was the owner of one hundred and twenty acres of land in Cedar county. They improved the land, and occupied it as a home for four years. Carroll purchased an equal quantity of land near by, and the two were occupied and farmed as one for two or three years. Carroll was then elected county auditor, and the family moved to Tipton. In the year 1879 the farm was sold,—the part owned by Mrs. Carroll, and probably all of it,—for thirty-five dollars an acre; and in December of that year Carroll purchased three hundred and fifty-five acres of land, known as the "McCrosky Farm," near Tipton, for twelve thousand seven hundred dollars. He occupied it with his family until the year 1883, when it was sold for fifty dollars per acre, and the Bond farm, containing more than nine hundred acres, in Johnson county, was purchased by Carroll; and he moved his family upon it, and continued to reside upon a portion of it until the year 1892, when he moved with his family to Iowa City. Parts of the Bond farm were sold to different persons. In the year 1884 Carroll conveyed an undivided one-third of the land he owned to two brothers of his wife, named Alexander and George Grace, and for some time thereafter Carroll and the Grace brothers carried on the farm as partners. Carroll had been interested in a grange store in Cedar county, and, on account of his connection with it, had become responsible for the payment of considerable sums of money; and in the year 1886, to protect the Grace brothers, to whom he was owing about six thousand dollars, he executed to them a conveyance of his remaining interest in the Bond farm. It appears, how-

ever, that there was no change in the occupation of the
farm, and he continued to be regarded by the parties con-
cerned as the owner of an interest in it until the year 1892,
when a settlement was effected, and he moved to Iowa City,
as stated.   When the settlement was made, ten thousand
dollars was found to be due him; and five thousand
seven hundred dollars in money, and four thousand
three hundred dollars in notes made by one Earl G. Cotter,
and secured by a mortgage, were delivered to him as pay-
ment of the amount found to be due.   Carroll moved to
Iowa City in February, 1892.   On the 27th day of June
of that year he entered into an agreement in writing for
the purchase of the premises in controversy from Andrew
Beermaker and Amanda, his wife, for the agreed price of
three thousand seven hundred and fifty dollars, of which
two hundred and fifty dollars were paid on the day the
agreement was made, and the remainder was to be paid "on
or before August 1, 1892, on possession being given of said
premises as herein stipulated for."   The agreement also
contained the following:  "On the payment of said sum,
three thousand five hundred dollars, being the balance
of the purchase price of said premises, the said Andrew
Beermaker and Amanda Beermaker agree that they will, on
or before the first day of August, 1892, execute to said
Moreau Carroll a good and sufficient warranty deed for said
premises, and show good title, and free from incum-
brance, and deliver possession of said premises to
said Carroll under said deed on or before the first
day of August, 1892.   It is further agreed that said Beer-
maker and his family may occupy, free of rent, from the
time of the making of said deed to August 31, 1892, the
front room below, the front room above, and the room above
immediately in the rear thereof, in said dwelling house."
Payment of the two hundred and fifty dollars by Carroll on
the contract the day it was entered into was made by a
check drawn on plaintiff bank.   On the next day a deed for

the lot was drawn, and in due time signed and acknowledged by Beermaker and his wife, which purported to convey the lot in question to Carroll; but it was not delivered to him until the 27th of July, 1892. Two days before that time he commenced to move into the house, and completed moving on the 26th, and since that time it has been occupied as the home of his family, although for about two weeks after the family moved into it the Beermakers continued to occupy a part of it. Carroll lived with his family until the 17th of May, 1895, when he absconded, and since that time his .family has not known anything of him. On the day the deed was delivered to Carroll, he borrowed of the plaintiff the sum of three thousand eight hundred dollars, which was placed to his credit on the books of the bank; and the payment of three thousand five hundred was made by means of a check, drawn against the credit of four thousand two hundred and eighty-eight dollars and twenty-two cents, which Carroll then had. For the loan Carroll gave his note as security, deposited the Cotter notes and mortgage, and when his note matured it was taken up, and a new note given therefor; and that process of renewal was continued until the note in suit was given. The decree of the district court subjects the premises in controversy to the payment of three thousand five hundred dollars of the debt of Carroll, with interest thereon from the date on which it was contracted.

I.    It is claimed that the premises in question were purchased with money which belonged to the intervener, and also that it was purchased with the proceeds of a former homestead. We do not think either claim is sustained by the evidence. It satisfactorily appears that the intervener at one time owned one hundred and twenty acres of land which was sold in the year 1879 for thirty-five dollars per acre; but it also appears that the land was then incumbered for an amount not shown, and that the incumbrance was paid from the purchase money. It is probable that a part of

the proceeds of that sale was paid on the purchase of the
McCrosky farm, but the amount of money paid on account
of that farm is not shown.  A few weeks after the contract
therefor was made, McCrosky acknowledged the receipt of
three hundred and eighty-six dollars on the contract.  That
contract provided, the land should be conveyed to Carroll free
from all liens, excepting such as he should assume.   What
incumbrances he assumed, if any, are not shown; but in Jan-
uary, 1881, he and his wife executed a mortgage on the farm
to secure the payment of three thousand dollars, and that
mortgage recited that it was subject to a mortgage for six
thousand dollars.   What money, if any, received from the
sale of the McCrosky farm was used in the purchase of the
Bond farm is not shown.   The only direct evidence which
tends to show that Mrs. Carroll had any interest in the farm
last named, or the proceeds of the sale, is furnished by an
attorney who drew the deed which Carroll executed to his
brothers-in-law in the year 1886.   That attorney testifies that
at the time the deed was executed a contract was drawn up
by which the Grace brothers assumed certain indebtedness on
the Bond farm, and agreed to pay Mrs. Carroll either two
thousand five hundred dollars or three thousand five
hundred dollars, which Carroll stated was the amount
he had received from the sale of her place in Cedar county.
Although both the intervener and Alexander Grace testify,
it is not shown whether the money was paid to her as pro-
vided by the contract or not; and, so far as the record shows,
she may have received the money, or her brothers may yet
be under obligations to pay it to her.  If it be conceded,
however, that the settlement made in 1892 superseded that
of 1886, it does not appear that any money which belonged
to the intervener was used in purchasing the premises in
controversy.    Although Carroll received five thousand
seven hundred dollars in money from his settlement with
the Grace brothers, his balance in bank on the 16th day of
June, 1892, was less than fifty dollars, and his balance

against which his check for two hundred and fifty dollars was drawn for the first payment on the lot was about five hundred dollars, and he is not shown to have had any other money. Before the last payment was made he had deposited in the bank the further sum of about three hundred and fourteen dollars; and on the day the last payment was made he had to his credit in the bank, exclusive of the proceeds of the loan the plaintiff made him, the sum of four hundred and eighty-two dollars and twenty-two cents. Therefore, of necessity, all of the last payment, except the sum last specified, must have been derived from the loan made by the plaintiff on the day the payment was made; and although an aggregate of seven hundred and thirty-eight dollars and twenty-two cents was paid on the lot, which might have been received from the Grace brothers, yet there is no evidence whatever that any of it belonged to the intervener. It is evident, also, from the facts we have set out, that, of the payments made, not more than the sum last specified could have been derived from the sale of a homestead. But the source from which Carroll obtained the deposits he made, and which made that sum, is not shown. Alexander Grace states that all which was found to be due Carroll on their settlement was paid to him on the first of March, 1892; hence the deposits made after June 16th do not appear to have been from the Bond farm. The sum allowed Carroll for the homestead is not shown. The amount received on the settlement included what was due Carroll, if anything was due, for his share of what the farm produced for eight years, and possibly the price of the personal property; and the most that can be said in favor of the claim of the plaintiff is that about fifty dollars of the money paid for the place in controversy, and possibly about seven hundred dollars in addition, may have been obtained from the Bond farm. But the burden was on the intervener to show what money, if any, which was derived from the sale of the homestead in the Bond farm, was used for paying for the homestead in

question.   She says that she always thought the proceeds of
the homestead in the Bond farm went into the homestead in
controversy, but it is clear she had no personal knowl-
edge of the matter.   We conclude she has not shown, with the
necessary certainty, that the home she is occupying, or any
interest therein, is exempt because the money used in its
purchase was obtained from the sale of a former homestead.

II.   It is claimed that, even if it be true that no exemp-
tion can be claimed on the grounds already considered, the
homestead character attached to the premises when the con-
tract for their purchase was entered into, and the payment
of two hundred and fifty dollars made; and especially when
the premises were occupied by Carroll as a home for himself
and his family two days before the debt due to the
plaintiff was contracted.   It is well settled that the
homestead right does not depend upon a title
in fee simple, but that it may attach to property held
under a lease (*Pelan v. De Bevard,* 13 Iowa, 53),
or under a bond or contract for a deed (*Stinson
v. Richardson,* 44 Iowa, 373; *Lessell v. Good-
man,* 97 Iowa, 681).   In this case the contract provided that
Carroll was not to be entitled to possession of the premises
until final payment should be made.   But this was a pro-
vision that could be waived by the parties, and if they did
waive it, and Carroll took possession under such contract of
purchase, his homestead right would attach at the time such
possession was taken, against all except then existing cred-
itors.   At the time the contract was made, Beermaker was in
California.   When the instrument was executed there were
present, besides Carroll, Mrs. Beermaker and one Stouffer,
who, as agent for Beermaker, negotiated the sale.   It is
important to know who took part in making the sale, as
bearing upon the question of waiver, for Beermaker was not
in Iowa City when the Carrolls went into possession of the
property.   As stated heretofore, Carroll made a cash pay-
ment at the time the contract was executed.   By the terms

of this agreement the balance was to be paid on or before August 1, 1892, "on possession being given of said premises." The undisputed testimony shows that Carroll and his family moved into the Beermaker house, with the consent of Mrs. Beermaker, and without objection from any person, on July 25, 1892. The furniture and household goods of the Beermakers had been largely moved out at this time, though the family retained two rooms for occupancy, and boarded with the Carrolls for about a week thereafter, when they finally vacated the premises. The possession so taken by Carroll on the 25th of July was under the contract. He had no other right or claim to the property. That he did not enter under mere sufferance on the part of the Beermakers is shown by the fact that they requested the privilege of occupying the rooms they afterwards held, until they should leave for the West. The fact that Mrs. Beermaker looked after the execution of the contract in her husband's absence shows that she was endowed with some authority in relation to the sale, and it is not questioned on the part of the vendors that Carroll's possession under the contract began when he moved in. This was two days before the indebtedness to plaintiff was incurred. It is true that negotiations for a loan had been pending for some time, but nothing was done which was binding upon either party in this respect until July 27th. At this time we think Carroll's homestead right had attached, and therefore plaintiff has no claim upon the property in suit.—REVERSED.

ON REHEARING.     Original opinion adhered to.

THURSDAY, OCTOBER 26, 1899.

WATERMAN, J.—A rehearing was granted in this case because of plaintiff's contention that nothing is said in the original opinion as to the claim made that Carroll borrowed the money to pay a part of the purchase price of the prop-

erty, and so used it, and therefore plaintiff is entitled to a lien upon the land. The writer thinks this question was disposed of by the finding of fact that the homestead right was acquired before the indebtedness to plaintiff was incurred. No particular complaint is made of this finding in the petition for rehearing. It is not insisted that we review it. But it is thought best, in view of the stress laid by plaintiff upon the proposition that it is entitled to a lien because its money went into the homestead, that we set out with more particularity the reasons upon which our conclusion is based. While it is true that Carroll used the borrowed money to pay for the property in question, it does not appear that it was any part of the contract between him and the bank that he should do so. On the contrary, the evidence, without dispute, discloses that the loan was made on the security of the Cotter notes and mortgage alone. Under these circumstances, the plaintiff is entitled to no lien on the homestead. It is not enough to show that the borrowed money was used to pay for the homestead, but, in order to confer a right to a lien, it must also appear that it was a part of the contract that this should be done. *Eyster v. Hatheway,* 50 Ill, 521; *Mitchell v. McCormick,* 22 Mont. 249 (56 Pac. Rep. 216). We do not overlook the fact hat the president of the bank testified that Carroll told him the money was wanted for the purchase of a home. But this was in the preliminary talk as to the loan, and does not seem to have entered into the terms of the contract. It was no part of the inducement to the loan, so far as disclosed by the evidence. When the money was placed to Carroll's credit, he was free, so far as his agreement with plaintiff was concerned, to do with it as he pleased. It is immaterial whether Carroll had a right to pledge the Cotter papers. We are not concerned with the value to the bank of those securities. The bank, at the time, supposed Carroll had such right, and we have only to do with the question as to what inducement operated to persuade it to part with

its money.   There is no equity in the bank's claim that, because it had lost the security which it took and solely relied upon, it should be given a lien upon the homestead.   *Akers v. Luse,* 56 Iowa, 346.

II.    There is another and a broader ground upon which we might rest the conclusion on this issue.   This indebtedness, having been incurred after the homestead right attached although it was for money paid on the purchase price, would confer on the creditor no right to a lien.   The statute (Code, section 2972), provides that the homestead is exempt from judicial sale, "where there is no special declaration of statute to the contrary."   Section 2976 provides that it may be sold for debts created by written contract executed by those persons invested with power to convey, when the contract expressly stipulates that it is liable, and also for debts antedating its purchase.   There is also a provision in section 2975 making it liable to mechanics' liens.   These are the only statutory provisions on the subject.   If we are to enforce liability in this case, it must be upon general equitable principles, and in the face of the prohibition of section 2972.   We can discover no warrant for so doing.   See *Lee v. Murphy,* 119 Cal. 364 (51 Pac. Rep. 549).   We have held that the homestead may be sold for purchase money indebtedness incurred at the time of the acquisition of the homestead right.   But this was upon the express ground that such indebtedness did not accrue after the homestead was acquired; that, in effect, it was an antecedent obligation.   *Christy v. Dyer,* 14 Iowa, 438.   In that case it is said: "The legislature, with a view of avoiding all constitutional questions, has made the exemption prospective, and not retrospective.   When the homestead has been purchased, then, as to all subsequent debts, it is exempt; for all prior ones, it is liable."   The cases relied upon by appellee are all distinguishable in their facts from the one we have here.   In each of them the indebtedness was incurred at the time the homestead right attached, while

in the case at bar, as we have found, the homestead was
acquired before the loan by plaintiff was made. That this
is a material distinction is sufficiently shown, perhaps, by
the language of our own statute; but it is not out of place
to say that it is elsewhere recognized. *Ruhl v. Kauffman,*
65 Tex. 728; *Loftis v. Loftis,* 94 Tenn. Sup. 232 (28 S. W.
Rep. 1091); *McCarty v. Brackenridge,* 1 Tex. Civ. App. 170
(20 S. W. Rep. 997); *Dresse v. Myers,* 52 Kan Sup. 126 (34
Pac. Rep. 349); *Eyster v. Hatheway, supra.* The con-
stitution of Tennessee (Article 11, section 11) provides, with
relation to the homestead exemption: "The exemption shall
not operate against public taxes nor debts contracted for
the purchase money of such homestead or improvements
thereon." In the *Loftis Case,* to which attention has just
been called, the court said, in construing this provision:
"The difficult and important question is presented in this
case whether money borrowed from a third person to pay
off the purchase money due the original vendor or his assignee
is a debt or liability contracted for the purchase, in the
sense of the statute and constitutional provision.   *   *   *
We think there is a marked difference between purchase
money and money borrowed to pay off purchase money,
and that a debt or liability contracted for the purchase of
land means a debt which has for its immediate and original
consideration such purchase. So long as the original con-
sideration of the debt remains,—the purchase of the land,—
the homestead cannot prevail against it, even though the
debt be assigned, renewed, or extended.   *   *   *   But,
when the original purchase money is paid by the use of
other money borrowed from a third person for that purpose,
the consideration of the debt incurred for borrowed money
is not superior to the homestead. If we hold that money
borrowed to pay off the purchase money must be held superior
to the homestead, then it logically follows that money bor-
rowed to pay off such borrowed money must also be held
superior, and this rule must continue through as many

removes and borrowing transactions as the needy debtor may be forced to make through a series of years.   *   *   * This would not be a sound rule.   *   *   *   The priority extended to debts contracted for the purchase money of a homestead is not the same as a vendor's lien for purchase money, and in nowise dependent upon the question whether the vendor has retained such lien.   *   *   *   The party who pays off such purchase money is not thereby substituted to the priority in favor of the original debt." Another distinction between the case at bar and those cited by plaintiff is that in each of the latter the money was paid by the creditor directly to the vendor or lienholder.   That this is regarded as material is shown by the cases we have cited above from the courts of Illinois, Kansas, and Texas, when compared with the authorities cited from those states by plaintiff, viz: *Loan Co. v. Everheart,* 18 Tex. Civ. App. 192 (44 S. W. Rep. 885); *Austin v. Underwood,* 37 Ill. 438; *Nichols v. Overacker,* 16 Kan. 54. In this case, the borrowed money was placed to Carroll's general account in the bank, and, while a part of it was doubtless paid out on the check given Beermaker, the vendor, yet it was so paid as Carroll's money and not as the money of the bank.   The original opinion is adhered to, and the judgment REVERSED.

LADD, J., concurs in the result, for the reasons stated in the first paragraph of this opinion. GRANGER, J., takes no part.

ROBINSON, C. J. (dissenting).   The supplemental opinion of the majority is so far based upon conclusions of law which seem to me to be erroneous that I am constrained to dissent therefrom, and to indicate objections, heretofore unexpressed, to conclusions of facts.   The decision of the trial court established in favor of the plaintiff a lien for the money which it had actually paid for Moreau Carroll to complete the purchase of the property in controversy.

The decision of the majority gives to the defendant property for which neither she nor her husband ever paid, and holds it exempt from liability for the purchase price actually paid for them by the plaintiff. That such a result is inequitable seems clear, and that it should be avoided, unless absolutely required by the law, is equally clear. The contract between Beermaker and Carroll did not give to the latter any right to take possession of the property until full payment of the purchase price should be made. There is no evidence, excepting the fact that Carroll moved into a part of the house a day or two before payment was made, that the contract was in any respect modified. In fact, Beermaker was at the time absent from the state, and the property seemed to have been the home of himself and family, and it does not appear that any one in Iowa had a right to modify the contract. Certainly, we should not presume that there was a valid alteration, in order to accomplish the inequitable result of depriving the plaintiff of the right to a lien on the property. It is true that the plaintiff relied upon the Cotter paper as security for the loan, but it does not appear to have otherwise waived any right it might have against the property in question. There can be no doubt that Carroll relied upon the promise of the plaintiff to make the loan in contracting for the property, and it is shown without dispute that the plaintiff paid the money in controversy, not to Carroll, but to the owner of the property, as a part of the purchase price. Until the payment was made, Carroll had no right, under his contract, to take possession of the property; and it seems to me clear, under the facts disclosed, that Carroll should be held not to have acquired the property, within the meaning of the law, until that payment had been made. It is true that a homestead right does not necessarily depend upon a title in fee simple, but may attach to a leasehold interest (*Pelan v. De Bevard,* 13 Iowa, 53); or to property held under a contract for a deed (*Stinson v. Richard-*

*son,* 44 Iowa, 373; *Lessell v. Goodman,* 97 Iowa, 681). But
in each of the cases referred to actual possession was taken
under the lease or contract, which created, in the person
claiming the homestead right, an interest in the premises
occupied. That actual occupation and residence, as a rule
are necessary to constitute a homestead, is settled. *Christy
v. Dyer,* 14 Iowa, 483. As stated, it is not shown in this
case that the possession taken by Carroll before final pay-
ment had been made was authorized. Indeed, that posses-
sion was but a part of the premises, the Beermakers retain-
ing actual possession of a part until after full payment
had been made. The statute makes a homestead liable "for
debts contracted prior to the acquisition." It was held in
*Christy v. Dyer, supra,* that a debt contracted for the pur-
chase money of a homestead cannot be said to have been con-
tracted after the purchase, and that the homestead is liable
for it. The debt in question was contracted before Carroll
was entitled to possession of the premises under his con-
tract, and therefore before the homestead right attached.
In other words, as it seems to me, the homestead had not
been acquired, within the meaning of the statute, until
after the debt in question had been contracted. The views
I have expressed appear to me not only to be founded in
reason, but to be authorized by statute, and to be sustained
by the weight of authority. In *Austin v. Underwood,* 37
Ill. 438, it was held that a creditor who had paid the pur-
chase price of a homestead was entitled to enforce his claim
against it. The case of *Eyster v. Hatheway,* 50 Ill. 520,
relied upon by the majority, was referred to and disting-
uished. In *Magee v. Magee,* 51 Ill. 500, the homestead was
held liable for the payment of a debt contracted to dis-
charge an obligation for a part of the purchase price. The
case of *Austin v. Underwood, supra,* was again distinguished.
The same rule was followed in *Carr v. Caldwell,* 10 Cal.
380. See, also, *Lane v. Collier,* 46 Ga. 580; *Hawks v.
Hawks,* 46 Ga. 204; *Nichols v. Overacker,* 16 Kan. 54;

*Loan Co. v. Everheart,* 18 Tex. Civ. Appl. 192 (44 S. W.
Rep. 885).   It was said in *Hopper v. Parkinson,* 5 Nev.
233, that "there can be no such thing as a homestead right,
as against the purchase money, unless the lien, whether
created by mortgage or existing by way of a vendor's lien,
has been relieved in some lawful way."   In *Stevens v.
Stevens,* 10 Allen, 146, it appeared that certain premises
were purchased by the defendant, who at once occupied
them as a homestead.   In the morning of the day of the
purchase the defendant borrowed of the plaintiff money,
and paid it to his grantor, as a part of the consideration
for the premises, at the time the deed was delivered.   After-
wards, and in the afternoon of the same day, the defendant
made to the plaintiff two notes for the money borrowed.
It was held that the debt must be regarded as contracted
prior to the acquiring of the homestead right, and that the
premises were subject to the payment of the debt.   See,
also, *King v. Stetson,* 11 Allen, 407.   In *Coleman's Adm'r.
v. Parrott,* * Ky. (32 S. W. Rep. 679), it is held that a
homestead is liable for the payment of the money borrowed
and used to pay the purchase price of the homestead.   Some
of the cases referred to were decided under statutes some-
what different from the statute of this state, and perhaps
announce a broader rule than our statute warrants; but
some of them do not, and in principle sustain the right of
the plaintiff to the lien it seeks.   Of the cases cited to sup-
port the conclusion of the majority, the case of *Eyster v.
Hatheway* is shown, by subsequent decisions of the court
which determined it, not to be applicable to such a case as
this.   In *Mitchell v. McCormick,* 32 Mont. 249 (56 Pac. Rep.
216), the court distinguished between that case and cases
like this, in which money is borrowed for the purpose of
purchasing a homestead.   The case of *Lee v. Murphy,* 119
Cal. 364 (51 Pac. Rep. 549), involved the application of stat-
utes of California in regard to unrecorded mortgages and
vendors' liens, and is so unlike this as, in my opinion, not

NOTE.— Not officially reported.—REPORTER.

to be in point. *Ruhl v. Kauffman,* 65 Tex. 726, did not involve any question found in this case. *Dreese v. Myers,* 52 Kan. Sup. 126 (34 Pac. Rep. 349), was governed by the rule of *Eyster v. Hatheway,* 50 Ill. 522, and is unlike this case. In *McCarty v. Brackenridge,* 1 Tex. Civ. App. 170 (20 S. W. Rep. 997), the court said that a "mere lender of money for the purpose of buying a homestead has no lien, unless there was at the time an agreement to that effect;" but the point thus considered was not involved in the case. The case of *Loftis v. Loftis,* 94 Tenn. Sup. 232 (28 S. W. Rep. 1091), appears to be most relied upon by the majority, and to be most nearly in point; but whether the money there in controversy was borrowed, as in this case, before the homestead right was acquired, or after, is not shown, and the court recognized the fact that there is a conflict in its own decisions as well as in the decisions of other states in regard to the correct rule. The case is not sustained by the weight of authority. It may be conceded, however, for the purpose of this case, that a homestead is not liable for money borrowed to discharge an obligation for the purchase price, previously entered into, without admitting that the lien asked in this case should be denied; for the reason that, as it seems to me, the evidence justifies the conclusion that the homestead right had not been created when the loan was made. The fact that credit was given to Carroll for the money before it was paid out does not appear to me to be material. In my opinion, the decree of the district court was authorized by the evidence, effected an equitable result, and should be AFFIRMED.