MARY L. BRUNSDON, Appellant, v. T. B. BRUNSDON et al., Appellees.

**HOMESTEAD:** Conveyance—Nonjoinder of Wife—Ratification and Estoppel. A wife who has assigned to her husband all her interest in a joint contract for a deed to their homestead property, may not be held to have ratified the act of the husband in later assigning the contract to a third party, without the wife's joining in such assignment, because of the fact that she stood by without objection while the third party placed an improvement on the property, or because of the fact that the third party mortgaged the property, when the wife had no knowledge of the assignment to said third party, or of the arrangement under which the improvement was being made, or that a mortgage had been executed, *until after the improvement was completed and the mortgage executed.*

**HOMESTEAD:**    Liability for Debts—''Purchase Price'' Defined. The ''purchase price'' of a homestead does not embrace the cost of an *after-erected* residence.

**HOMESTEAD:**    Improvements—Equitable Lien. Record reviewed, and held insufficient to entitle a party to an equitable lien for improvements placed in good faith upon a homestead under a contract which was void as to a homestead claimant. (But see Sec. 10155, Par. 3, Code, 1924.)

**MORTGAGES:**    Validity—Rights of Party in Possession. A mortgage on a homestead, executed by one whose title is void, is not a lien against the homestead claimant who was in open and notorious possession.

**Headnote 1:**   29 C. J. p. 915.    **Headnote 2:**   29 C. J. pp. 866, 868. **Headnote 3:**   29 C. J. p. 928; 31 C J. pp. 323, 342.    **Headnote 4:**   29 C. J. p. 918; 27 Cyc. p. 1187.   .

*Appeal from Polk District Court.*—L. L. THOMPSON, Judge.

NOVEMBER 19, 1924.

REHEARING DENIED APRIL 8, 1925.

ACTION in equity, to quiet title to certain real property in the city of Des Moines against an alleged mortgage lien and a claim (not a mechanics' lien) for labor and material furnished for a residence erected on the said premises during the building season of 1920 by the appellee T. B. Brunsdon. Decree establishing and confirming the lien of the mortgage and establishing and foreclosing an equitable lien in favor of T. B. Brunsdon for the material and labor furnished for the building. Plaintiff appeals.—*Reversed as to the mortgage lien, and modified and affirmed as to the other claim.*

*Charles Hutchinson,* for appellant. ,

*C. C. Putnam, Judson E. Piper,* and *Stipp, Perry, Bannister & Starzinger,* for appellees.

STEVENS, J.—I.   Mary L. Brunsdon, appellant herein, and William M. Brunsdon were, at the time of the transactions in-

volved in this controversy, husband and wife. T. B. Brunsdon is the brother of appellant's husband. Appellant and her husband, on April 13, 1914, obtained a contract for a deed to Lot 5, and on February 23, 1918, a contract for a deed to Lot 6, all in Block 3, Broadmoor, an official plat in the city of Des Moines. Harry H. Polk & Company was named as grantor in each of said contracts, which ran to appellant and her husband jointly. On or about March 20, 1920, appellant assigned her interest in the contracts to her husband, who, on April 9th following, assigned the same to his brother, T. B. Brunsdon, one of the appellees herein. The consideration agreed to be paid for the lots was paid in monthly installments; and on May 11, 1920, T. B. Brunsdon paid the balance, of $154.98, due thereon, and received a warranty deed to himself to the property. On January 1, 1921, T. B. and William M. Brunsdon entered into a written contract for the reconveyance of the premises to the latter, upon the payment of $7,950, in the manner and upon the terms specified in the contract. There was an old residence on Lot 5 at the time the contract for a deed was entered into. Appellant and her husband moved upon the property and resided in the old residence until May 8, 1918, when it was totally destroyed by fire. A garage having in the meantime been erected upon Lot 6, the family moved into it, where they lived until Thanksgiving, 1920, when they moved into a new house erected thereon by T. B. Brunsdon, which forms the subject-matter of this controversy. On February 1, 1920, T. B. Brunsdon executed a mortgage upon the described premises to James K. Turner, one of the appellees herein, to secure the payment of a loan of $2,000. William M. Brunsdon built the foundation for the new residence at his own expense. T. B. Brunsdon furnished all of the material and labor and constructed the house, in pursuance of an oral contract between himself and William M. Brunsdon, by the terms of which title was to be taken by the former, and a new contract for a deed was executed by him to William M. after the improvement was completed. As already stated, a written contract was subsequently executed, in pursuance of this oral agreement. Appellees filed separate answers to appellant's petition, the appellee Brunsdon pleading

1. HOMESTEAD: conveyance: nonjoinder of wife: ratification and estoppel.

as defenses ratification and estoppel, and Turner setting up the mortgage executed to him by T. B. Brunsdon. As affirmative relief, both prayed that their respective claims be established as liens upon the property. No mechanics' liens were filed, either for labor or material furnished, against the property.

The court entered judgment *in rem* against the property in favor of T. B. Brunsdon for $4,367, the balance due him, and established the same as a lien upon the property, decreed a foreclosure thereof, and ordered special execution to issue if not redeemed by appellant within 90 days, barring all right of redemption after that date. The court also confirmed and established the lien of the mortgage, making the same senior to the other lien. Subject to the above, the court found that appellant was the owner of the property in fee simple, and quieted title in her. No appeal was taken from this portion of the decree. The decree quieting title in appellant was no doubt based upon a prior decree entered September 1, 1922, in an action brought by appellant for a divorce, by the provisions of which she was given all the right, title, and interest of her husband in the property in question.

We will first dispose of the issues tendered by the answer and cross-petition of the appellee T. B. Brunsdon. Although appellant and her husband were in possession of the property under a contract for a deed, only, it nevertheless constituted their homestead. *Stinson v. Richardson*, 44 Iowa 373; *Johnson County Sav. Bank v. Carroll*, 109 Iowa 564. The statute exempting the homestead from judicial sale is as follows:

"Sec. 2972 [Code of 1897]. The homestead of every family, whether owned by the husband or wife, is exempt from judicial sale, where there is no special declaration of statute to the contrary."

See, also, Section 10150, Code of 1924.

Because of certain additions therein to Section 2976, Code of 1897, we will set out Section 10155, Code of 1924, which specifies and classifies the debts for which the homestead is liable.

"Sec. 10155. The homestead may be sold to satisfy debts of each of the following classes:

"1. Those contracted prior to its acquisition, but then only

to satisfy a deficiency remaining after exhausting the other property of the debtor, liable to execution.

"2. Those created by written contract by persons having the power to convey, expressly stipulating that it shall be liable, but then only for a deficiency remaining after exhausting all other property pledged by the same contract for the payment of the debt.

"3. *Those incurred for work done or material furnished exclusively for the improvement of the homestead.*

"4. If there is no survivor or issue, for the payment of any debts to which it might at that time be subjected if it had never been held as a homestead."

The portion italicized above first appears in Chapter 237, Acts of the Fortieth General Assembly.

One of the contentions of appellee, which we will later discuss, is that the property in question is liable for the purchase price thereof. Construing Section 2976 of the Code of 1897, we have repeatedly held that the homestead is not exempt from execution on a judgment for purchase money. *Christy v. Dyer,* 14 Iowa 438; *Hyatt v. Spearman,* 20 Iowa 510; *Campbell v. Maginnis,* 70 Iowa 589; *Clifton Land Co. v. Davenport,* 130 Iowa 94. Unless the claim of appellee may be classified as purchase money, or the pleas of ratification and estoppel or of an equitable lien may be sustained, the property in question is exempt from execution on any judgment entered in favor of appellee against either appellant or her husband.

Before proceeding to a final discussion of the facts or the authorities relied upon by appellee to sustain his pleas of ratification and estoppel, attention should be directed to certain statutory provisions relating to conveyances of the homestead.

"Sec. 2974, Code of 1897 (Sec. 10147, Code of 1924). No conveyance or incumbrance of or contract to convey or incumber the homestead, if the owner is married, is valid, unless the husband and wife join in the execution of the. same joint instrument, whether the homestead is exclusively the subject of the contract or not; but such contracts may be enforced as to real estate other than the homestead at the option of the purchaser or incumbrancer."

The only thing assigned by appellant was her joint interest

in the contract to her husband. This manifestly did not in any way affect or alter the status of the property as a homestead. The exemption thereof from execution is for the benefit of the family, and not for the husband or wife alone. *Green v. Farrar & Wheeler*, 53 Iowa 426; *Harsh v. Griffin*, 72 Iowa 608. The homestead can only be conveyed by a joint instrument, signed by both the husband and the wife. This is the plain provision of the statute, which has frequently been construed and applied in the decisions of this court. *Belden v. Younger*, 76 Iowa 567; *Barnett v. Mendenhall*, 42 Iowa 296; *Clay v. Richardson*, 59 Iowa 483; *Donner v. Redenbaugh*, 61 Iowa 269; *Clark v. Evarts*, 46 Iowa 248; *Alvis v. Alvis*, 123 Iowa 546; *Keeline v. Clark*, 132 Iowa 360. Although we have held that the joint assignment of a title bond by the husband and the wife is sufficient to convey the homestead (*Rubelman v. Rummel*, 72 Iowa 40), nevertheless, under the doctrine of the above mentioned cases, the assignment of the contracts by William M. Brunsdon to appellee was wholly void. This has been specifically held with reference to similar transactions. *Belden v. Younger*, supra. Further, we have held that a conveyance of the homestead by the husband under a power of attorney from the wife is void (*Keeline v. Clark*, supra); and that a conveyance by the husband is not validated by the act of the wife in subsequently executing a separate instrument of conveyance thereto (*Alvis v. Alvis*, supra); and that the oral consent of the wife to the execution of a written contract signed by the husband alone does not meet the requirements of the statute (*Donner v. Redenbaugh*, supra).

But it is also well settled that a void instrument by which the husband has attempted to convey the homestead may be ratified by the wife, and she may thereby be estopped from setting up the statute which requires, for a conveyance of the homestead, the execution of a joint instrument. *Spafford v. Warren*, 47 Iowa 47; *Sawyer v. Perry*, 62 Iowa 238; *Seiffert & Wiese Lbr. Co. v. Hartwell*, 94 Iowa 576; *Drake v. Painter*, 77 Iowa 731; *Epperly v. Ferguson*, 118 Iowa 47; *Pagel v. Tietje*, 193 Iowa 467; *Shaffer v. Miller*, 195 Iowa 891; *Townsend v. Woodworth*, 185 Iowa 99.

Having thus briefly summarized the previous decisions of this court bearing upon the issues involved, we will now pro-

ceed to a somewhat lengthy recital of the record.

Appellant and her husband lived unhappily together, there being many quarrels between them, and numerous actions for divorce. There was also great animosity between appellant and appellee T. B. Brunsdon. The latter furnished the cement for the foundation of the house, at a cost of $75. Appellant had a check in her possession, payable to herself, for that amount, which she indorsed, and which her husband turned over to T. B. Brunsdon in payment for the cement. Appellant claims that the check was taken from her possession without her knowledge and consent, and that, before it was presented to the bank, she stopped payment thereof. This resulted in an open breach between her and T. B. Brunsdon. Sometime in November, 1919, appellant being ill, she entered the Methodist hospital in Des Moines, where she remained until about the middle of February, 1920, when she went to a local hotel for a time. She testified that at this time she was entirely out of money, and that, after she went to the hotel, her husband requested her to assign her interest in the lots to him, and that she declined to do so; that finally he left the hotel and went to reside with his mother and T. B. Brunsdon, leaving appellant without money for the support of herself and her ten-year-old son. A few days later, appellant went to the home of her mother-in-law, for the purpose, as she testified, of inducing her husband to return to the hotel; but while she was there, an altercation ensued between herself and T. B. Brunsdon, who forcibly ejected her from the house. Appellant's husband returned with her to the hotel, where they stayed that night. Appellant testified that they quarreled all night, and that her husband cursed and swore at her, and threatened several times to leave if she did not assign the contracts to T. B. Brunsdon. This, she testified, she steadfastly refused to do, but finally consented to assign the same to her husband. The assignments were executed about a week later.

Appellant is corroborated by the testimony of a witness that she and her husband made two visits to the office of Polk & Company before the assignments were executed, although this is denied by William M. Brunsdon. The morning after the events just narrated, appellant called the office of Polk & Com-

pany over the telephone and talked with a woman employee, the witness above referred to. Both testified that appellant told her that she was in a tight place and that she was going to have to assign the contracts, but that she did not want to do so. Later in the day, when she and her husband went to the office, the employee referred to refused, on account of the telephone conversation with appellant, to make out the assignments, giving as an excuse that no officer of the company was present. Appellant's testimony as to what occurred at the hotel is corroborated by that of her son, and to some extent by the testimony of a female employee, who was sleeping in a near-by room.

Appellant further testified that she knew nothing of the assignment of the contracts by her husband; that she never consented thereto, and at all times refused to join therein; and that the first she knew of the written contract between her husband and T. B. Brunsdon was about the time the house was completed, when she discovered a copy of it in his traveling bag. Her claim that she then went to the office of Polk & Company to ascertain whether her husband had assigned the contracts to appellee is corroborated by the employee of that office above referred to. Appellant and appellee T. B. Brunsdon would not deal with each other. On this point the evidence is conclusive. Concerning the arrangement between William M. Brunsdon and T. B. Brunsdon, the latter testified as follows:

"I told him I would not go ahead and do any building there unless I had the deed in my own name; that, if the woman would stop payment on this check and claim it was a forgery, what would she do if I went ahead further? I don't think there was any more talk at that time. I didn't do any more work there or order any more material for a while. Nothing further was said about building a house until the following spring, of 1920; then he brought me a contract like Exhibit 3 and asked me if I would sign that, and I told him I would not. I told him there was only one way I would go ahead, and that was that he would deed the place to me, and then, when it was completed, I would give him a deed back for it, after we had made a contract. My brother and his wife were living together at that time. I didn't know a thing about her assigning a contract to me. It was never discussed before me. She didn't say anything about as-

signing it to me in March, 1920, when she came to my mother's house. We did talk about building the house, though. Plaintiff was there then, but didn't take any part in the conversation. This was in March, 1920. She didn't offer any objection to the plan I talked of. A month after that, my brother came to the house and said she had signed the contract over to him and he would assign them to me, which he did, at Harry Polk's office. * * * I had nothing whatever to do with the plaintiff during that time. She never made any suggestions to me about the building. With regard to the incident she says I came there one Sunday afternoon along in September, 1920, I heard her testimony as to what I told her,—that I built the house and that it was my place,—and that is about what I said. I am positive the floors were laid and a good deal of painting done after that. Mr. Brunsdon and his family occupied the house almost as soon as it was completed,—about Thanksgiving Day, 1920. * * * I told him I would still go ahead if the contract was signed over to me. I was talking with my brother about building the house, at the time Mrs. Brunsdon came to my mother's house in March, 1920, and we continued to talk about it. Just went on with the conversation. It is quite possible that Mrs. Brunsdon did not hear all of the things that I and my brother said that night. I and my brother and my two sisters and my mother were in the room when Mrs. Brunsdon was there. Mrs. Brunsdon didn't take any part in the talk about the house. She and I got into some kind of dispute later, and I threw her out of the house; but that was not in connection with building the house. When she came to the door, I told her she could come in if she would behave herself. She didn't say she would behave herself, but she came in under those conditions. If Mrs. Brunsdon ever learned anything from me about the contract for building the house, she heard it that evening. This was the only time she had any opportunity to learn from me what the contract was. I felt more or less hostile to her still at that time. I did not start building the house again in 1920 until after these contracts were assigned to me by Bill. With regard to whether I had an impression that Mrs. Brunsdon would be very much averse to making an assignment to me after I threw her out of the house, I don't know. I didn't have any impression, one way or the other. I realized

that she seemed not to like me, and I would not naturally think that her affection would be increased by my throwing her out in the street. I never talked with Bill anything about how he got the assignment from his wife. * * * From sometime in April, 1920, until I had this conversation with Mrs. Brunsdon in the latter part of September, where I told her I owned the house and that she could get off of the place, I never spoke to Mrs. Brunsdon on the place there, and she never spoke to me, that I know of. I was there very frequently. All day, sometimes. She never came in the house nor around the house to look over the house while I was working on it. Never made any suggestions to me about how I should fix the house or where she thought anything should go, or whether a thing was put in right. She never looked over the plans of the house, so far as I know. * * * I did not have any further conversation with Mrs. Brunsdon after this time in September, before they moved into the house. That is the one and only conversation I had with her during the entire time, and that was to the effect that I owned the house, and she could get out.''

The testimony of appellant is contradicted in some particulars by William M. Brunsdon, but the preponderance of the testimony as to the matters stated above is in her favor. The only other testimony having a material bearing upon the issues of ratification and estoppel is, in substance, as follows: At the time the oral agreement was entered into between appellant's husband and appellee for the erection of the house, appellant had an action for divorce pending in the district court of Polk County, in which an attachment had been levied upon the property. It was necessary that the attachment appearing on the abstract obtained at the time the mortgage to Turner was executed, be released. The action for divorce was dismissed, and the attachment released by appellant, at the request of her husband. The latter testified that he explained to appellant why this was necessary, but this was denied by her.

Appellant further testified that she first learned of the contemplated mortgage early in the third week of January, 1921, together with the name of the lawyer to whom the abstract had been referred for examination. She immediately went to the attorney and advised him of what she had heard, and that the

premises were occupied by her as a homestead. This testimony is not disputed. Isabel Cowan, the employee of Polk & Company above referred to, testified that she at some time was informed that the purpose of the assignment of the contracts by appellant to her husband was to enable him to make a deal with appellee T. B. Brunsdon to build a house on the lots. She was uncertain from whom she obtained the information, but if from appellant, it was probably after the building had been completed. Similar testimony was given by one Lorenz, an officer of Polk & Company. The witness was, however, unable to state that he obtained the information as to the purpose of the assignment from appellant.

Do the above facts present a correct basis upon which to rest a finding of ratification and estoppel? Whatever else may be found, it is certain that appellee at no time or in any particular relied upon anything that was said or done by appellant in furnishing labor or material for the improvement. The conditions upon which he consented to furnish the necessary material and build the house were dictated absolutely by him. Appellant was entirely ignored, and during all of the time she was held at arm's length. The only communication between appellant and appellee was on the two occasions when they quarreled; and she made no suggestion to the latter at any time during the building of the house. She did suggest to her husband that a porch be built on the south side of the house, and he procured that to be done. Appellant throughout her testimony denied that she in any way consented to the assignment of the contracts by her husband to appellee or to the arrangement that was made with him to build the house. In these claims she is corroborated by the testimony of other witnesses and by the inferences to be drawn from the record stated above. She did not want appellee on the premises, and apparently did not hesitate to so declare, both to him and to her husband. It is probable that appellee and William M. Brunsdon believed that the latter had legal authority to bind appellant by the assignment of the contracts. No such authority existed. Appellant also testified that her husband again suggested, while they were in the office of Polk & Company, that the assignment be made directly to Tom, and that she refused to do it, and started to leave the office,

declaring that she would not do so. It is true that William testified that appellant knew of the oral contract between himself and appellee, and that he explained to her the reason of his request for the release of the attachment. This she denied, and we think her claim finds corroboration in the relationship of the parties. The testimony of the employees of Polk & Company is of little force, and perhaps goes as far to sustain the testimony of appellant as that of her husband. Of course, appellant, who resided on the premises, knew that appellee was building the house; but he at all times refused to in any way recognize or deal with her. The only thing appellant did that could possibly constitute a ratification was to move into the house, when completed, with her husband. That this is insufficient requires no demonstration.

One other fact should be mentioned. William M. Brunsdon testified that appellant employed an attorney to prepare a contract to be signed by appellee for the reconveyance of the property to her and himself after the building was completed. A contract in which the names of the parties are written, but in which the other blank spaces are not filled out, and which is claimed to be the one in question, was offered in evidence. Appellant denied that she procured such a contract to be executed or at any time talked with her husband about the matter.

We shall refer but briefly to the authorities cited and relied upon by appellee to sustain the plea of ratification and estoppel. None of them goes so far as to sustain such a plea upon the facts stated. In *Spafford v. Warren,* supra, *Sawyer v. Perry,* supra, *Epperly v. Ferguson,* supra, and *Luttschwager v. Fank,* 151 Iowa 55, it was disclosed that the husband and wife signed joint instruments irregular in form, or on different dates, and otherwise imperfect. In each of these cases, the court recognized the necessity that the husband and wife join in the same instrument. *Seiffert & Wiese Lbr. Co. v. Hartwell,* supra, and *Pagel v. Tietje,* supra, simply reaffirm the general doctrine of equitable estoppel, as applied to cases of this character. In all of the other cases, the plea of estoppel was based upon transactions in pursuance of which both the husband and the wife voluntarily abandoned the premises as a homestead. Appellee's plea of ratification and estoppel cannot be sustained.

II.  As already stated, the homestead is not exempt from execution on a judgment for the purchase price.  It is contended by appellee that the cost of the house must be treated as a part of the purchase price; but the purchase price in this case was the price fixed in the contracts between Polk & Company and appellant and her husband, and not such price augmented by the cost of the house. The assignment of the contracts by William M. Brunsdon to appellee being void, appellant was in no wise bound thereby. These assignments could neither operate in favor of appellee as a ratification nor against appellant as an estoppel.  The cost of the house was in no sense a part of the purchase price of the contract assigned by appellant to her husband.  Of course, it was a part of the consideration of the written contract between William M. Brunsdon and appellee, but this transaction had no effect upon the homestead right of appellant, and existed wholly independent and apart therefrom.

2. HOMESTEAD: liability for debts: "purchase price" defined.

The further contention is urged by appellee that, where a party in good faith takes title to a homestead under a void conveyance and makes judicious improvements thereon which are not inconsistent with the circumstances of the parties owning the homestead, the homestead is liable therefor.  *Stinson v. Richardson*, supra, and *Parsons v. Moses*, 16 Iowa 440, are relied upon at this point. In the former of the above cases, the purchaser in good faith placed certain improvements upon the premises and collected a larger amount as rents.  He was allowed to offset the cost of the improvements against the rent.  In the other case, the court held that, in an action under the Occupying Claimants Law, to recover the value of permanent improvements upon real estate, the same might be offset against the rents and profits which had accrued during the period.  The distinction between these cases and the application sought to be made thereof to the case at bar is obvious.  We find nothing in the record upon which to base an equitable lien in favor of Brunsdon upon the property.  Section 2975, Code of 1897, makes the homestead subject to a mechanics' lien for work, labor, or material done or furnished exclusively for the improvement; but no mechanics' lien was filed.  On this branch of the case we reach the conclusion that

3. HOMESTEAD: improvements: equitable lien.

the only portion of appellee's claim that can, upon any theory, be recognized as purchase money is $154.98 which he paid to Polk & Company. Whether, under the circumstances, this constituted a mere voluntary payment, we have no occasion to determine. No such claim is asserted. Appellee should have judgment for this amount, with interest at 6 per cent from the date of payment. In all other respects, the finding and decree of the court below with reference to appellee's claim must be vacated and set aside. This includes the portion of the decree relating to the equity of redemption.

III. We come now to consider the mortgage executed by T. B. Brunsdon to Turner, and the lien which the court confirmed and established against the homestead in his favor. Ap-

4. MORTGAGES: validity: rights of party in possession.

pellee Turner was furnished an abstract of title to the property before the mortgage was executed. The abstract was referred to an attorney for examination, who, in addition to other requirements, advised appellee to investigate as to who was in possession of the property. This he failed to do. Had he done so, he could readily have learned the truth. Appellant was in possession thereof all of the time, and asserting her homestead right therein. A purchaser of real property is charged with notice of the interest or claims of a party in possession thereof. *Koon v. Tramel,* 71 Iowa 132; *In re Estate of Gill,* 79 Iowa 296; *Truth Lodge v. Barton,* 119 Iowa 230; *Leebrick v. Stahle,* 68 Iowa 515; *Lowther Oil Co. v. Miller-Sibley Oil Co.,* 53 W. Va. 501 (44 S. E. 433). In the latter case, the court, referring to the character of the notice imparted by the possession of real property, said:

"The earth has been described as that universal manuscript open to the eyes of all. When a man proposes to buy or deal with realty, his first duty is to read this public manuscript,— that is, to look and see who is there upon it, and what are his rights."

The term "purchaser" includes "mortgagee." *In re Estate of Gill,* supra.

Appellee Turner could not, therefore, be an innocent holder of the mortgage. Appellant's possession of the property was with notice to him of appellant's right therein. Certain exceptions are recognized to this general rule, but the facts in this

case do not bring it within any of them. *Koon v. Tramel,* supra; *May v. Sturdivant,* 75 Iowa 116; *Elliot v. Lane,* 82 Iowa 484; *Crooks v. Jenkins,* 124 Iowa 317. Whatever interest T. B. Brunsdon may have acquired in the property by reason of his oral contract with William M. Brunsdon and the conveyance to him of the legal title by Polk & Company, he could not execute a valid mortgage thereon, as against the homestead right of appellant. It is clear that the mortgage did not become a lien upon the property. The conclusion arrived at in this case may result in the doing of a grave injustice to appellees, but a court of equity cannot so expand its proper jurisdiction as to completely override statutes or ignore established doctrines.

It follows from what we have already said that the judgment against the property in favor of appellee T. B. Brunsdon must be so modified as to reduce the judgment to $154.98, with lawful interest from the date thereof. Judgment will be entered in the court for the amount due. The mortgage lien decreed in favor of appellee Turner must be canceled, set aside, and held for naught. It is so ordered.—*Modified and affirmed* as to the claim of T. B. Brunsdon; *reversed* as to the mortgage of the appellee Turner.

ARTHUR, C. J., and EVANS and VERMILION, JJ., concur.