# CHARLESTON.

LOWTHER OIL CO. *v.* MILLER-SIBLEY OIL CO.

URPMAN *v.* LOWTHER OIL CO.

Submitted January 30, 1903.    Decided May 2, 1903.

1. OIL LEASE—*Title.*
    Title under a lease only for production of oil and gas is inchoate and contingent, and for purposes of search only until oil or gas is found. If not found, no estate vests in the lessee, and his right, whatever it is, ends when the unsuccessful search is abandoned. If found, then the right to produce becomes a vested right upon the terms of the lease. Point 2 of syllabus in *Oil Co.* v. *Gas Co.*, 5 W. Va. 583, explained. (pp. 505-7).

2. OIL LEASE.
    Power of chancery to cancel oil leases for delay of development. (p. 572).

3. OIL LEASE—*Abandonment.*
    To constitute abandonment by the lessee of a lease for oil there must be both an intention to abandon and actual relinquishment of the leased premises. (p. 507).

4. OIL LEASE.

Where an oil and gas lease is for a given term, "and as much longer as oil and gas can be produced in paying quantities" to the lessee, if a well pays a profit, even a small one over operating expenses, it produces "in paying quantity," though it never repay its cost, and the operation as a whole may result in loss. The phrase "paying quantity" is to be construed with reference to the judgment of the operator. when exercised in good faith. (p. 508).

5. EQUITY—*Contract.*

Equity will not grant specfic performance of a contract to convey land when the vendee has unreasonably delayed in performing the contract and asking relief, and conditions have changed and it would work hardship and loss to the vendor or other persons affected thereby. (p. 509).

6. EXECUTORY CONTRACT—*Vendee.*

When a vendee has not possession under an executory contract of sale of land, in order to have equity to grant specific performance, he is held to greater diligence in performing the contract and asking performance than is the case of a vendee in possession under the contract. (p. 509).

7. ESTOPPEL.

Estoppel from conduct discussed. (p. 510).

8. CONTRACT.

A written contract, sealed or unsealed, may be rescinded by word of mouth by common consent of its parties. If no possession has been taken under it, and the parties agree to rescind, and in execution of the agreement to rescind the vendee surrenders the writing to the vendor, the rescission is complete, and the contract at an end. (p. 511).

9. EXECUTORY CONTRACT—*Fraud—Equity.*

An executory contract for the sale of land made with intent on the part of both parties to defraud creditors will not be specifically enforced in equity at the instance of the guilty vendee, or one to whom he has sold the land. (p. 512).

10. EQUITABLE TITLE—*NOTICE.*

One who buys a mere equitable title to land is not a *bona fide* purchaser without notice, but takes only such title as his vendor has, and subject to all defences good against him, though in fact such purchaser had no notice of them. (p. 513).

11. NOTICE TO PURCHASER.

Actual possession is notice to purchasers of the rights of him in possession. (p. 514).

Appeal from Circuit Court, Calhoun County.

Action by A. W. Urpman against the Lowther Oil Company, and by the Lowther Oil Company against the Miller-Sibley Oil Company. Actions were consolidated. From the decree, Urpman and the Miller-Sibley Oil Company appeal.

*Affirmed.*

REECE BLIZZARD, NORTHCOTT & PERRY, and MR. O'BRIEN, for appellants.

T. P. JACOBS and JOHN M. HAMILTON, for appellees.

BRANNON, JUDGE:

Two chancery suits in the circuit court of Calhoun County were consolidated by order of the court, (as I think they should not have been, as they involved distinct subjects,) and were heard together, and a joint decree made in the two cases. One was a suit by the Lowther Oil Company against Miller-Sibley Oil Company; the other a suit by A. W. Urpman against the Lowther Oil Company. A joint appeal from that decree was taken by Urpman and Miller-Sibley Oil Company.

### THE MILLER-SIBLEY CASE.

James Metz made a lease, 24 May, 1897, to Miles for oil and gas purposes of a tract of 250 acres of land in Calhoun County. The lease was to continue three years from date "and as much longer as oil and gas can be found in paying quantities." It contained no provision for rental or forfeiture. It provided for payment to Metz of a royalty of one-eighth of oil produced, and $200.00 yearly for each gas well. It provided right to the lessee to remove machinery, and to "at any time surrender this lease and be relieved from all liability thereunder." Miles assigned the lease to Miller-Sibley Oil Company, and it bored a well and found some oil, but by reason of tools becoming fastened in the well or from an invasion of salt water, this well was abandoned, and another well was bored, and in it a small quantity of oil was found, its quantity being a matter of controversy, but, say from two and three-fourth to five barrels per day. This well was pumped for oil. Two tanks were partly filled,

one of 250, the other 60 barrels. The quantity of oil does not appear. The first well was pumped some and a little oil obtained from it. The second well was pumped several months. The operations were suspended. The last pumping was in January, 1899; but a witness says that a little pumping was done in March, 1899. Some of the casing was pulled from the first well. Nearly all the casing was drawn from the second well and taken away. No tools were left. The rigs were left to decay. There were an engine and boiler left at the first well, but parts of the engine taken away, and then an order was given to Warden by the agent of the Miller-Sibley Company authorizing him "to remove the engine, boiler and tanks, casing, tubing, sucker rods, &c." Warden at once moved the engine only. This order dates December 11, 1900. The two rigs were left and a boiler and some other articles used in the business. .The company owned leases on other land in the vicinity, making up in all 800 or 1000 acres. This tract is stated in the lease to be a part of a block of 800 acres of leased land owned by Miles. The company drilled two wells on these other lands in developing the territory. These wells were not far from the tract of 250 acres. One of the wells produced gas, not oil. No royalty was ever paid to Metz by Miller-Sibley Co. On 9 January, 1900, Metz executed to Lowther a lease of the same tract for oil and gas purposes, and Lowther assigned this second lease to the Lowther Oil Company, and in June, 1900, that company went upon the land and endeavored to utilize the first well which had been bored by Miller-Sibley Co., but failed, and then went to the second well bored by that company and cleaned and pumped it, but did not succeed in producing oil in paying quantity, only one barrel a day, and then bored it to greater depth and produced oil in paying quantity. Then the Lowther Oil Company brought a chancery suit in the circuit court of Calhoun County against Miller-Sibley Oil Company to restrain the latter company. from entering on the land or interfering with the possession of the Lowther Oil Company of said land, and to declare the first lease, that made by Metz to Miles, no longer in force, and to cancel it. The decree of the circuit court avoided and canceled the first lease and the Miller-Sibley Company appealed. The first question is whether there was any estate vested in Miller-Sibley Company when Metz made the second

lease. The lease requires no rent, only a share of oil, and gives absolute right to the lessee to surrender it, and under *Eclipse Oil Co.* v. *South Penn,* 47 W. Va. 27, gives no present vested estate, and might be ended at any time by either party, and a second lease would end it. That is the character of this lease. But when once the lessee under even such a lease begins work, whilst he yet has no vested estate, still he has right to go on in search of oil, and the lessor cannot then at mere will destroy his right. An ordinary oil lease, making the lessee pay a consideration, binding him to some obligation, vests only inchoate right, that is right to explore for oil, but no actual other estate than right to develop, and if he gets no oil, he still has no vested estate; but if he does get oil, he has a vested estate. Such a lease calls for the right, not to oil in place, but to extract it. *Steelsmith* v. *Gartlan,* 45 W. Va. 27; *Lowther Oil Co.* v. *Guffy,* 52 W. Va. 88; 43 S. R. 101; Bryan on Petro. & Gas, 174 citing *Venture Oil Company* v. *Fretts,* 152 Pa. 451; *Colgan* v. *Oil Co.* 194 Pa. St. 234. Just so with the lessee under a lease without rental or obligation after he has begun or after he has obtained oil. When he has obtained oil, he has a vested interest according to the lease. In *Oil Co.* v. *Gas Co.,* 51 W. Va. 583, in point 2 of syllabus, is language that "mere discovery of oil by exploration under it, vests no title to it in the lessee." This language is inadvertent, and does not express the meaning intended, as on page 591 it is stated that discovery of oil does vest title. As above stated when Miller-Sibley Co. discovered oil an estate vested in it according to the lease, which it could lose only by terms of the lease or by abandonment. It is said that the oil was not in paying quantity, and therefore no estate vested. · Whether the oil is in paying quantity is left to the judgment of the lessee, and I do not see that where oil is found its quantity is material in deciding whether any estate vested under the lease. We must therefore see whether this estate has been lost. The lease contains no provision of express forfeiture. Under some circumstances of delay or fraudulent evasion of duty of development equity will cancel an oil lease, as development is regarded as the real intent of the lessor, even if there be no express clause of forfeiture. *Crawford* v. *Richey,* 43 W. Va. 252; *Bluestone Coal Co.* v. *Bell,* 38 W. Va. 297; *Betman* v. *Harness,* 42 W. Va. 433; Bryan on Petro. & Gas section 182, citing *West-*

*ern Pa. Co.* v. *George,* 16 Pa. 47; *Elk Fork Oil Co.* v. *Jennings,* 84 Fed. 839. But this doctrine cannot apply under the facts of this case. We must inquire whether there has been an abandonment; for an oil lease can be lost by abandonment. The loss of valuable property by mere abandonment is not easily shown or readily held by the courts. "To constitute abandonment in respect of property, there must be a concurrence of intention to abandon and actual relinquishment of the property, so that it may be appropriated by the next comer." "In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry; for there can be no abandonment without the intention to abandon." 1 Cyc. 4, 5. It appears to me that abandonment may be more readily found in case of oil leases than in most other cases. An oil lease is a venture, a right of exploration only, giving its owner no other right, worthless if the search is not successful. In this instance Miller-Sibley Co. bored a well, pumped it several months, got but little oil, not filling the tanks, abandoned that well. True, it is said that the tools getting fastened caused its abandonment; but it gave poor prospect. Then the company bored a second well, yielding from two and three-quarters to five barrels a day, though pumped for months. The company moved its tools and appliances off the Metz farm to other undertakings several miles away. It left nothing at the well very valuable to use in further efforts. The rigs remained; but in that timber country it would not be profitable to transfer them. The casing was mostly pulled out. An engine and boiler were left for a while, but the engine was partly dismantled, and later taken away. The agent gave an order to remove practically all left on the premises. He left the State. Wells bored on other tracts some distance away produced only gas. The search for oil in four wells in that section was unsuccessful. It was a new field, what oil men call in homely but expressive language "wild cat territory." March 15, 1900, Lowther wrote Miller & Sibley saying that he held various oil leases in that section and proposing to put them in with those of Miller & Sibley, and on 19 March, 1900, Miller-Sibley Oil Co., by its president wrote in reply acknowledging receipt by date of this particular letter, saying "We have decided not to operate in W. Va. for the present, and consequently do not take advantage of your offer."

Miller-Sibley Co. quit work January 1899, practically in No-- vember, 1898, and the Lowther lease was 9 January, 1900. There had been a cessation of work for a year. The lease went to record 19 March, 1900. The Lowther Oil Co. began work in June, 1900, more than fifteen months after Miller-Sibley Co. ceased work. The oil in the tanks was not marketed, but wasted; the derrick and other parts of the rig went to decay. These circumstances taken together establish abandonment by Miller-Sibley Co.

It is argued that there were no pipe lines nearer than ten miles to convey oil, and that the company made fruitless efforts to get the Eureka Pipe Line Co. to extend a line to that section. This would put in the the lease a condition for excuse not in it. The first lease gave Metz not a cent of return except a share of oil. His motive in making it was therefore only development. It is not reasonable, but unjust, that an oil company should thus bore two wells, discontinue work, remove implements, do nothing for a year, give plain sign of no intent to go on, and yet hold Metz's land tied up. How long would it remain bound up so as to pre- vent him from contracting with others to develop? True, this may not alone show intent to abandon; but it tends to show that we ought not demand any more evidence than is manifest in the case to establish abandonment. If, as is claimed now for the pur- pose of this case, oil in paying quantity was found, where did the company get the right to indefinitely suspend and not pay Metz his share of oil? Not from the lease. His right was to have the well worked or surrendered. Must we not conclude that the company regarded its search on this tract as vain and gave it up? "Title under an oil lease is inchoate and for pur- pose of exploration only until oil or gas is found. If it is not found, no estate vests in the lessee, and his title, whatever it is, ends when the unsuccessful search is abandoned." *Calhoun* v. *Neely,* 201 Pa. St. 97.

It is contended for the Lowther Company that oil was not produced in paying quantity and that when it went upon the premises the three years term of the first lease had expired. To this it is answered that the lease gave a term of three years "and as much longer as oil and gas can be produced in paying quantities." What is meant by that provision? It means pay- ing quantity to the lessee. "If the well pays a profit, even small,

over operating expenses it produces in paying quantity, though it may never repay its cost and the operation as a whole may result in a loss. The phrase 'paying quantities,' therefore, is to be construed with reference to the operator and by his judgment, when exercised in good faith." *Young* v. *Oil Co.*, 194 Pa. St. 243; Bryan, Petro. & Gas, 109. The case further says that if oil or gas is not found, and the lessee is not willing to go on and incur further expense, the conditions stipulated for the termination of the lease has come.   So, if he finds oil, but it ceases to pay expense of production.   The lessor cannot determine whether oil is in paying quantity.   Neither can a subsequent lessee.   There is no strength in the argument that the lease ended alone from want of oil in paying quanty.   Still, we may consider quantity in coming to a conclusion as to whether the lessee abandons.

It is suggested that the word "can" in this quantity phrase, is different from the word "is" commonly used.   I do not see any appreciable force in the suggestion.   Does it impart a power in the lessee to leave the wells and premises indefinitely?   I see no error in the decree so far as respects this case.

### THE URPMAN CASE.

James W. Metz, father of John W. Metz, made a written agreement, 22 January, 1892, selling and binding himself to convey to John W. Metz a tract of seventy acres of land, for $800.00, of which the document says $450.00 was paid in mules, cows, and a wagon, and for the balance John W. Metz gave three notes payable yearly thereafter, which agreement was recorded on its date. The tract is a part of the tract of two hundred and fifty acres leased by James W. Metz to Miles and then to Lowther and operated by Miller-Sibley Co., and then by Lowther Oil Co., as stated above in the Miller-Sibley case. By deed dated 16 February, 1901, John W. Metz conveyed said seventy acres to A. W. Urpman. Urpman brought a chancery suit against Lowther Oil Company, James W. Metz and others to enforce specific performance against James W. Metz of said executory contract of sale made by James W. Metz to John W. Metz by compelling James W. Metz to pass a legal title to the seventy acres to Urpman. James W. Metz having leased the tract of two hundred

and fifty acres to Lowther for oil, including said seventy acres, and Lowther having assigned the lease to the Lowther Oil Co., and the said company having gone upon the premises and bored and found oil a short time before the date of the conveyance of the seventy acres from John W. Metz to Urpman, -Urpman's chancery suit also sought to enjoin the Lowther Oil Company from taking oil, and to annul the lease under which it was operating as a cloud on Urpman's title. The Lowther Oil Company answered Urpman's bill relying upon the validity of the lease from James .W. Metz under which it was operating, and in turn prayed that the agreement of sale between James W. and John W. Metz and the deed from John W. Metz to Urpman be cancelled and annulled and declared void as to its rights. The decree did declare them void as to the Lowther Oil Company and James W. Metz, and Urpman appealed.

The contract between James W. Metz and John W. Metz being on record, the rights of Lowther and the Lowther Oil Company under the second lease would be later and subordinate to rights under that sale agreement, if enforceable. No possession was taken under it by John W. Metz. This is an important fact bearing on delay in failing for more than nine years to enforce the agreement; for when a vendee is in possession delay is more excusable, and time does not so soon bar his right. *Abbott* v. *L'Hommenieu,* 10 W. Va. 678; Pomeroy on Contracts, section 404; 2 Warv. on Vendors, section 746;. *Tate* v. *Pensacola,* 53 Am. St. R. 251; Fry on Specif. Perform  section 738. When in possession we can almost say time is no matter; but when he is not, it is far different. Why, if he has a just right of possession is he not in? If John W. Metz had good claim for the seventy acres, why remain out of possession over nine years, and buy and live on another. tract in the neighborhood, as he did? His delay constituted confession of no just right. The application for specific performance of a contract is addressed to the sound discretion of the court. He who asks it must have shown himself prompt and willing to comply with the contract on his part, and it will not be granted, if it would be inequitable and work hardship towards the party against whom it is asked. *Dyer* v. *Duffy,* 39 W. Va. 148, 159. The rule is more strictly applied in specific performance than in suits for account. *Coal Co.* v. *Bell,* 38 W. Va. 297. If since the con-

tract the value of the land has greatly increased, and the condition changed, or the vendor is in a condition where enforced performance would greatly damage him, and especially where the purchaser is chargeable with the delay by reason of failure to perform, equity will refuse to compel the vendor to convey. *Booton* v. *Scheffer,* 21 Grat. 474; *Patterson* v. *Martz,* 34 Am. D. 474; *Vail* v. *Nelson,* 4 Rand. 478. In Vol. 1, p. 181, of that late valuable equity work, Am. & Eng. Dec. in Equity, many instances of short delay barring relief are given and the subject discussed. "Laches does not, like limitation, grow out of the mere passage of time; but it is founded upon the inequity of permitting the claim to be enforced. An inequity founded on some change in the conditions or relations of the property or parties. *Galliher* v. *Caldwell,* 145 U. S. 368.

Let us pause to bring in some facts of the case in connection with these principles. The purchaser delays over nine years. He does not pay any of $325.00 deferred purchase money, and thus was never in a condition to call for a deed. About five or six years after the sale oil interests increase the value beyond comparison with the value of the land at the date of the sale. The purchaser still pays nothing, but lets four more years go by without asking performance, he right near his father in the neighborhood. His father all the time in possession using the land as his own. This son and purchaser being weekly at his father's and knowing of his father's use of the land. In fact, he rents the land of his father one or two seasons for cropping, paying a share of the crop. His father leases the land to Miles for oil, and under the lease Miller-Sibley Oil Co. bores two wells, the purchaser utters not a whisper against it, though well knowing it, and often visiting the land during oil operations. The father makes a second lease to Lowther under which the Lowther Oil Co. developes oil, the purchaser present when this lease is made; well knowing of it, frequently on the land during the operations, standing by and seeing the oil company spend large amounts of money, and give forth not a whisper of protest. Even when oil gushed out as from a cornucopia of wealth asking no deed from his father. Suppose this purchaser were himself to ask a court to compel his father to make a deed? What court would give him a deed? Urpman has only Metz's rights—no more. His father had made

a binding covenant by his second lease, which would ruin him, if broken by giving a deed to the son or Urpman. And then it would entail great loss on the Lowther Oil Company in favor of John W. Metz when he stood silent on the ground when it was spending thousands of dollars. As to the oil company a decree of performance would violate that principle of estopped *in pais* which says: "No principle of equity seems better established, or more readily applied in equity, than that if a person knowing his rights stands by and encourages. or permits an innocent party to purchase his property or to make valuable improvements upon it without making known to such purchaser his rights in the property, is estopped from afterwards asserting any claim to it." *Heavener* v. *Godfrey,* 3 W. Va. p. 433; *Norfolk and Western Railroad Co.* v. *Perdue,* 40 W. Va. 442. We must not think that the rights of a stranger to the contract are not to be considered in a contest as to its performance between its parties; for often the fact that its enforcement will impose loss on a stranger will deny a decree to enforce it, even where no such estoppel as that just mentioned is present. *Anthony* v. *Leftwitch,* 3 Rand. 238.

Another reason against the decree of performance is that the agreement of sale, if ever complete, was rescinded by both vendor and vendee. The contract states that the price of the land was paid in stock and a wagon and in these notes. James Metz never got the stock, but his son took it off to Roane County and sold it for his own use, and he never executed the notes, and he never took possession of the land, and he later surrendered to his father the written agreement. The motive of sale was base. John W. Metz being in debt, in order to get the personal property out of his hands away from creditors, to delay them until he should become able to pay them, went through the form of paying it to his father on the land, making a sale document and recording it. He did not deliver the personal property. Was it ever a consummated contract? It seems not. If so, no rights come from it. But pass that feature. They afterwards rescinded. But was that oral rescission good? It is not a deed passing legal title. That can only go back by deed. Such a written contract may be rescinded by word of mouth, if the contract be destroyed pursuant to agreement, or possession be returned. *Cunningham* v. *Cunningham,* 46 W. Va. 1. Now, the

surrender to its maker of the written contract with intent to re-
scind is surely tantamount to actual destruction. "It has been
held in some of the earlier cases that an agreement to rescind
is as much an agreement concerning land as the original con-
tract, and hence should be in writing; but all the later cases,
both in England and the United States, are unanimous in af-
firming that a contract in writing may, in equity, be rescinded
by parol; and this even though the contract may have been un-
der seal. Such rescission may be affected not only by an express
agreement, but by any course of conduct clearly indicating a
mutual assent to the termination or abandonment of the con-
tract. It may consist either of words or acts, and all the cir-
cumstances attending the transaction may be shown to prove
intention; but if evidenced by acts alone, they must be such as
to leave no doubt as to such intention." 2 Warv. on Vendor,
section 826. See *Ballard* v. *Ballard,* 28 W. Va. 470, and *Straley*
v. *Perdue,* 33 *Id.* 375, holding these principles. Not merely
James W. Metz, but John W. Metz, waived, abandoned and ig-
nored this contract long ago, long before Urpman got his deed,
and this abandonment defeats specific performance. *Payne*
v. *Graves,* 5 Leigh 561. "The rule seems to be well established
that specific performance will not be decreed of a contract
which the parties have treated as rescinded, or which has once
been repudiated by the parties." Warve. on Vendors, section
758. In section 759 such rescission is stated to be a bar to spe-
cific performance.

There is another all-sufficient ground to refuse Urpman spe-
cific performance. The contract which he asks equity to en-
force is not executed, but executory. It was made with intent to
defraud creditors, and equity will neither enforce nor cancel it
but leave the parties alone. "This rule applies not only to the
original parties to the fraudulent transaction, but also to their
heirs and all parties claiming under or by title derived from
them where no equitable rights intervene to protect such par-
ties." *McClintock* v. *Loisseau,* 31 W. Va. 865. See *Slifer* v.
*Howell,* 9 W. Va. 391. There are other reasons, however, for
a decree declaring this agreement void as to the Lowther Oil
Company. It is true Urpman had no notice of the fraud in-
fecting the sale contracts, but his deed conveyed only in equity,
and a purchaser of only an equity gets only such title as the ven-

dor has. Such a purchaser knowing that the legal title is outstand‑
ing is not a *bona fide* purchaser like one getting legal title. The
fact that the legal title is not in his vendor is notice of the risk
he assumes in buying mere equity, and he takes only what his
vendor can convey, or that which his vendor can call upon a
court of equity to convey to him. He takes the equity with all
its infirmities upon its head, subject to all defences to which it
was subject in the hands of his vendor. *Briscoe* v. *Ashby,* 24
Grat. 478; *Walton* v. *Hargrove,* 97 Am. D. 429, note 433; *York*
v. *McNutt,* 67 *Id.* 607.

In view of the several reasons ample of themselves to justify
the decree denying Urpman relief by specific performance, I
will add another equity principle, and that is, that specific per‑
formance in courts of equity is not a matter of absolute right,
as arising from a debt of justice, but lies only in a sound dis‑
cretion of the courts. The court has a right to look at all the
circumstances and say whether justice and right demand a
grant of performance of it. Hogg's Eq., section 396; *Abbott*
v. *L'Hommedieu,* 10 W. Va. 677. Surely under all the facts
we cannot say that such discretion was improperly exercised.

It is argued that as the sale agreement was on record, and
the rescission of the agreement was not, the latter cannot pre‑
vail, as there is no notice to Urpman. The record of the agree‑
ment has nothing to do with the case. It would only concern
purchasers from James W. Metz, not John W. It is no factor
on the questions whether the agreement was rescinded, or was
fraudulent, or whether there was *laches.* Of course, the rescis‑
sion being oral, could not be recorded.

Under the above stated legal principle that specific perfor‑
mance rests in the sound discretion of the court, in addition to
the facts already given, as further reason to justify denial of re‑
lief to Urpman, I state that no injustice is done to him because he
purchased when he had notice of the right of the Lowther Oil
Co. by their lease on the open record, by actual possession of the
land by the Lowther Co., and by communications from John W.
Metz. Why did he buy knowing of the possession of the Low‑
ther Oil Co., and its operations? As Judge Green beautifully
expressed the doctrine in *Frame* v. *Frame,* 32 W. Va. p. 478:
"The earth has been described as that universal manuscript
open to the eyes of all. When a man proposes to buy or deal

with realty his first duty is to read this public manuscript, that is, to look and see who is there upon it, and what are his rights." Possession is notice to the world of the rights of the occupant. *Ellison* v. *Turpin,* 44 W. Va. 414. Besides notice constructive Urpman was actually on the ground and saw the Lowther Company operating. And besides Urpman seeing the sale contract on record conceived the project of defeating the Lowther Oil Company by purchasing of John W. Metz, sent for him to come to Grantsville, and proposed to purchase of Metz, when Metz told him he had no right, did not own the land, but Urpman said, "We thing you have," and insisted on buying, and had Metz to execute a deed with special warranty, he refusing to warrant, for the consideration of $1,500.00 when the land was worth thousands more, and it being then night, took a notary upwards of three miles to Metz's home and got his wife's signature at the midnight hour, seeming fearful that the Lowther Oil Company or some one might intervene. He gave checks to one Matthews to hold till the notary returned with the deed. Metz says he was intoxicated. This is denied by evidence. But say that he was lured by this amount of money, to him, an unlettered mountaineer, a big sum. He soon repented of bringing trouble upon his aged, decrepit father, afflicted with dropsy, asked Urpman to take back his checks as he would loose nothing. It semes the money is in the hands of Matthews, and that Metz has never received it. These things Metz swears to, and Urpman did not go on the stand to deny. What has Urpman lost? Where is injustice done to him? Anyhow, no one is to blame but himself; for he, not John W. Metz, conceived the transaction and was the active agent. It was a speculation that failed. That is all.

We must therefore affirm the decree.

*Affirmed.*