### DODDRIDGE COUNTY OIL & GAS CO. v. SMITH et al.

### SMITH et al. v. DODDRIDGE COUNTY OIL & GAS CO

(Circuit Court, N. D. West Virginia. July 24, 1907.)

1. CORPORATIONS — ACTIONS AGAINST — EVIDENCE — RELEVANCY — BOOKS AND RECORDS.

Where a man deals with a corporation under a written contract, undisputed and unambiguous, and subsequent controversy arises solely over the question whether or not such corporation has complied with its requirements, he is not entitled, ordinarily, in the trial of such issue, to enter into an extensive and exhaustive inquiry as to the private and internal affairs of the corporation, or to demand its records and papers relating to its organization, stockholders, outside obligations, and other like matters.

2. MINES AND MINERALS—OIL AND GAS LEASE—FORFEITURE FOR DEFAULT OF LESSEE.

Defendant executed an oil and gas lease on his farm to one who assigned the same to complainant corporation. At the same time, as claimed by defendant, he entered into a contract with the lessee giving him an option to purchase, within a stated time, certain completed wells on the land, and the machinery, tools, and materials thereon. The existence of such contract was in dispute, but in any event it was not assigned to complainant. The lease required the lessee to drill a well within four months, and another within the succeeding four months. Complainant drilled the first, using, with defendant's consent, his machinery and tools and some of his materials. While the second well was being drilled for complainant by a contractor using said machinery and tools, the alleged option expired, and defendant appeared, and demanded of the contractor payment of the stipulated price, or that he cease work, in consequence of which the contractor stopped work, and the time for completion of the well expired before it could be finished, and defendant declared a forfeiture of the lease and took possession of the wells and complainant's property on the land. *Held*, that complainant had nothing to do with the option contract, if it existed, and that its expiration afforded no justification for the action of defendant in stopping the work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, § 206.]

3. SAME—DEFAULT CREATED BY LESSOR.

While courts of equity, contrary to their rules, will enforce forfeitures of oil and gas leases where necessary to protect the rights and equities of

the landowner, owing to their exceptional character, their powers cannot be invoked as against a lessee who has carried on the work in good faith and expended large sums in developing the leased property to enforce a forfeiture created by the lessor by an act of bad faith which caused a default on the part of the lessee.

4. BAILMENT—OIL AND GAS LEASE—USE OF MACHINERY OF LESSOR—TENURE OF BAILEE.

Where an owner of land solicited another to take an oil and gas lease thereon, stating that all he wanted was to have the farm developed, and that he had a rig, boiler, and certain casing on the land not in use which would materially lessen the cost of a well, and after making a lease the lessee made use of such machinery and materials with the lessor's consent, in drilling, it did not do so as a mere licensee; but it was so used for the mutual benefit of the parties under an implied assumpsit to return it and pay for its use or to pay for such as was not returned, the lessor had no right to reclaim it while it was being used in drilling a well and without fair notice of his intention to do so.

5. MINES AND MINERALS—FAILURE OF LESSEE TO CONTINUE DEVELOPMENT—REMEDY OF LESSOR.

Where an owner leases land for oil and gas purposes, his remedy for failure on the part of the lessee to further develop the leased premises or to properly protect the lines from drainage through wells on adjacent property is ordinarily by action at law for damages, and not by way of forfeiture of the lease.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, § 206.]

6. SAME—LEASE CONSTRUED.

A provision of an oil lease, giving the lessee the exclusive right not only to drill for, but to produce, oil on the leased premises, must be construed to apply only to wells drilled in the future.

In Equity. On final hearing on bill and cross-bill.

On January 17, 1906, the Doddridge County Oil & Gas Company, a Delaware corporation, filed in this court its bill against Frank and Martha J. Smith, citizens of Doddridge county, this state, alleging the execution of an oil and gas lease by said defendants to Anson H. Russell, Jr., under date of October 19, 1901, upon a tract of 800 acres owned by them in Doddridge county, and the assignment thereof by Russell on January 31, 1905, to complainant company. That, by virtue of said lease and assignment, said company became vested with right to enter upon said land, bore for oil and gas, lay pipe lines, transport oil and gas and water therein across and over said land for a term of five years, or as long as oil and gas should be found in paying quantities; to use, free, oil, gas, and water necessary for operations, erect necessary buildings, structures, and to remove all machinery and fixtures placed by it upon the land. The conditions of the lease are alleged to be, in part, that the landowners should receive one-eighth of the oil royalty, retain the use of the land for farming purposes, except such parts necessary for mining purposes, a payment of $300 annually for each gas well, and free gas for domestic purposes, that drilling of a first well should commence within 40 days of the date of the lease, and a second one within 40 days from the completion of the first, and in like manner the whole property should be developed. The bill then charges that complainant company has fully complied with the requirements of said lease and has expended large sums of money in drilling two wells, erecting derricks, machinery, and laying 2,500 feet of oil and water pipes. That in this condition of things the defendants fraudulently conceived the plan of seizing and taking possession of the premises under a pretended and fraudulent claim of forfeiture of the company's right, and, with threats of personal violence to the company's agents and servants, on April 21, 1905, entered upon the premises, forcibly and unlawfully took possession of the wells and all the company's machinery and property, drove out its agents and servants, and ever since denied the company's right to use and enjoy its rights

and property, converted to their own use the oil and gas produced by the wells, and threatened to drill other wells, to the irreparable injury and loss of the complainant company.

The prayer of the bill is for injunction, accounting, and, pending litigation, for the appointment of a receiver. Upon the presentation of this bill supported by the affidavits of Anson H. Russell, H. L. Wilson, and W. S. Smith, this court granted a preliminary restraining order against the defendants, restraining them from further interfering with the premises and rights claimed by complainant company, from further conversion of the oil and gas gas involved, and from drilling other wells. By this same order, entered January 17, 1906, C. D. Elliott, marshal of this district, was appointed receiver and directed to take possession of and keep the property subject to further order. On January 29, 1906, the defendant Frank Smith filed his answer to the bill, and also the affidavits of himself and Charles Smith, and by leave of the court the defendants jointly filed their cross-bill against the complainant company. To the answer general replication has been filed by the company, and it has also filed its answer to said cross-bill, to which the plaintiffs therein have filed a general replication. It has also filed an amended bill reiterating the allegations of the original bill, and further making one W. H. Carr a party, and charging a claim upon his part antagonistic to its rights and derived from the Smiths, in and to the oil from one well, the nature of which claim is alleged to be unknown to it, but asking that Carr be required to answer and disclose the same. To this amended bill defendant Frank Smith has filed answer, to which replication has been made, and, by several orders entered, the restraining order has been continued to this final hearing; both sides having filed their depositions in the cause. By the allegations of the answers of Frank Smith and those of the cross-bill, it appears that the claim of defense substantially is that Martha J. Smith is simply the wife of Frank Smith, with no interest in the land leased except her inchoate right of dower; that, prior to the execution of the lease to Russell and his assignment thereof to plaintiff company, three wells had already been drilled upon the property, and defendant Frank Smith had upon the property certain machinery and material, such as engines, boilers, derricks, tanks, casing, and line pipe; that, on the same day he executed this lease to Russell, he also gave him a written option, running six months, to purchase at an agreed price the output (less one-eighth royalty) of these three wells and all this machinery and material; that when the Doddridge Oil & Gas Company drilled its first well —which turned out to be a gas one—it used said Smith's boiler and engine and consumed a portion of his pipe, also erected its derrick from his material; that when it started its second well it used Smith's boiler and engine, and, after the work had progressed, the option to buy said machinery and material and output having expired without compliance, said Smith served notice upon plaintiff company to drill no longer with, but to surrender to him, his engine and boiler, or else pay him therefor, upon reception of which notice the company ceased drilling, and, after a lapse of time, Smith further served notice of the forfeiture of the lease, and then took possession of the premises (including the company's property), employed W. H. Carr to finish the well, agreeing to give him a fourth interest therein, which interest Carr sold and conveyed afterward to Thos. B. Smith, who in turn sold and conveyed it back to said Frank Smith. It is therefore denied that the original lessee, Russell, or his assignee, the plaintiff company, has kept and performed the terms of the lease, and, on the contrary, it is charged that a complete forfeiture has been suffered and abandonment made thereof. In cross-bill it is charged that Smith, in addition to finishing the second well (known as No. 5), has drilled in another (known as No. 6), which is a fair producer, and it is admitted that plaintiff company is entitled to the gas well first drilled by it, and has on the premises 4,000 feet of line pipe, about 900 feet of 8¼-inch casing, 250 feet of 6⅝-inch casing, a wooden rig, and a 600-barrel water tank, the value of all which does not exceed $1,200. But it is claimed this property is subject to a lien in favor of Smith for injury and damage for "failure to comply with the terms and conditions of the lease and the option to purchase the property therein mentioned, and for loss of casing and material, and for the use of the casing and material and machinery."

And the prayer of this cross-bill is that an injunction be awarded Smith against the company inhibiting it from disposing of or removing from the premises any property, or disposing of its rights or interest, charging it to be insolvent; that authority be given the receiver to take full control over the property and estate of said company; that a decree be entered canceling and declaring forfeited the lease; that an accounting of Smith's damage be had and general relief be granted him.

By its answer to this cross-bill the company has substantially denied all its material allegations, except that it says that, as to derricks and material used by it in drilling the first or gas well, it was loaned to it by Smith, with the understanding it was to be returned, replaced, or paid for, and any part not so returned, replaced, or paid for it proffers to pay for. It denies that it used Smith's boiler and engine in drilling the second well, and alleges its contractors agreed to furnish their own boiler and engine. It admits that Smith allowed such contractors to use certain of his property up to April 19, 1905. It reiterates the charge that Smith cut off the water supply to the boiler and forcibly evicted the company's contractors, servants, and agents from the premises. It admits the drilling by Smith of well No. 6, and charges the conversion by him of the oil therefrom up to the date of the appointment of the receiver.

W. S. Smith and Bemis & Calfee, for Doddridge County Oil & Gas Company.

George W. Johnson, for defendant Frank Smith.

DAYTON, District Judge (after stating the facts as above). Something like 625 pages of typewritten evidence has been filed in this cause. At the threshold of its consideration, I think I may be justified in saying that, where a man deals with a corporation under a written contract, undisputed and unambiguous, and subsequent controversy arises solely over the question whether or not such corporation has complied with its requirements, he is not licensed, ordinarily, in the trial of such issue, to enter into an extensive and exhaustive inquiry into the private and internal affairs of such corporation or demand its records and papers relating to its organization, stockholders, outside obligations, and other like matters.

Appeals, in evidence and argument, ad hominem, are naturally distasteful, and sometimes embarrassing, to judges sitting in equity. They must necessarily guard themselves against that natural feeling of resentment against the implied imputation that arises from resort thereto that they will be weak enough to be influenced by them.

The execution of the lease in controversy in this cause is undisputed. It is not vital whether in the forenoon or afternoon of its date. Its assignment by Russell, the original lessee therein, to plaintiff corporation, and a part performance of its requirements by it with full personal and record notice, on the part of defendants, of such assignment and part performance, also are not denied, but admitted. The single defense made is that, after such part performance, there was such abandonment and refusal to operate under it as to justify defendant Smith in holding it forfeited. Under such issue, it was wholly immaterial to institute the extended inquiry found herein into the organization of the company, who its stockholders were, how much of it Crawford had or was to have, or how much any one else had or was to have, how Russell disposed of his stock or was to dispose of it, or how any one else disposed of or was to dispose of it, what Mrs.

Erb wrote about her subscription to it, what prices the stock sold for, what Crawford, Wilson & Co. or any other promoters had to do with the formation of the company, and what circulars they may have issued to secure stock subscriptions.

In my judgment the demand, repeatedly made, for the production of this company's books, records, and papers in order to elucidate these wholly irrelevant matters, was very properly ignored.

Witness Ashburton's private account book, containing some 130 odd pages of accounts of hauling done by him for various parties, 1 or 2 pages only relating to his account against Russell and plaintiff company, has been filed. That Ashburton did this hauling is, in my judgment, absolutely immaterial to any issue involved, and, besides, it is not disputed, and I can see no good reason why his private book of accounts should, even with his consent, be perpetuated in the records of this court. Much time has been devoted in this testimony to the questions of whether or not Smith, on the day he executed to Russell this lease, also executed to him an option or conditional sale for the three producing wells and machinery then on the land, and whether W. S. Smith, attorney for plaintiff, had, the latter part of July or the first of August, 1905, met and had a conversation with defendant Frank Smith on the road between West Union and the latter's farm, touching the difficulties that had arisen. The latter fact is clearly immaterial, and the former, in my judgment, substantially so, for reasons hereinafter to be given.

Sifting this testimony, and giving it construction the most favorable possible to defendant Smith, the material facts may be stated to be these: Smith owned this 800 acres of land; had leased it for oil on three prior occasions to separate parties or companies. A number of wells had been drilled upon it. The exact number, with singular lapse of memory, he is unable to state. Three, on October 19, 1904, were producing oil in quantities shown to be, in the aggregate, less than three barrels per day. He had bought these wells and a lot of machinery from the companies that drilled them. In reply to advertisement of Crawford, Wilson & Co. for oil territory, he wrote to them on September 12, 1904, that he had such. On September 16, 1904, in reply to their letter of inquiry, he wrote, or caused his son to write for him, a letter giving the quantity and location of his land, and that he had three producing wells. He further said:

"I also have rig, boiler, casing, and in fact everything necessary to drill another well, which is not in use at this time but is laying on farm. There is also gas on farm which I own and which can be used in drilling."

Also:

"I have no map of this block, but if you want an investment of this kind I would like to have you come and look at this and see for yourself. I will lease it all, or any part, to suit parties, and will lease on reasonable terms, as all I want is the farm developed."

On September 30, 1904, he wrote the same parties, among other things, as follows:

"The oil is found in the Indian sand about 2,000 feet deep and about 88 feet in the sand. It costs about 85 cents per foot to drill. They use about 150 feet 10-inch casing, 1,200 feet 8-inch casing, and about 1,900 feet 6¼-inch casing

in one well. To complete a well with entire new rig; etc., complete and casing new will cost about $6,000.00. But by my having enough material of all kind on ground and which has been used once it could be completed for a good deal less."

The result was that Russell went to West Union, the lease to him was executed, and immediate steps were taken by him to locate and start the drilling of a well. The weather was dry, water scarce, and the work retarded in consequence. On January 31, 1905, the lease was assigned to the Doddridge County Oil & Gas Company, and this company completed this well, which was a gas one, and then promptly started another. In drilling the first well an engine, boiler, some pipe, casing, and some parts of an old derrick, owned by Smith and upon the ground, were used by his consent and apparently because it was well understood by all that they should be used. When the second well was started, the engine and boiler, which were being repaired and kept in order by the company or its contractors, were again put in service by Smith's consent and with his full knowledge. The work on this second well progressed well, and it had been drilled about 1,600 feet, within 500 feet of completion, on the 19th of April, 1905, when Smith appeared, notified, not the company or its agent, but one of its contractors, to at once pay for this machinery, etc., or cease drilling under pain of becoming personally responsible therefor. This contractor stopped work, and, after he left, but the same night, Smith returned, took the cap off the main shaft of the engine, carried it away, and hid it. His son apparently had been employed by the company, and it was part of his duty at least to see that water to run the engine was in the tank. It was ascertained that little or none was there, and the presumption naturally arose that none was to be permitted to be used or furnished. Wilson testifies that the next day he tried hard to talk with Smith and ascertain the trouble and settle it, without avail. Whether this be true or not, certain it is that Smith had determined to stop operations there, and that effectively. Why? The reason he gives is that at the same time he executed the lease to Russell he also had executed an option or conditional bill of sale to Russell, whereby he agreed to sell the three producing oil wells and this machinery, casing, etc., to him for $10,000, if paid for in six months. The wells at the time were almost or quite valueless; the less than three barrels a day scarcely warranting the expense of keeping them cleaned out and in condition and of pumping them. The machinery, second-hand, was not worth at the highest estimate anything like half $10,000. Smith and his son insist this option was executed. Russell, supported by Wilson, denies that it was, although Wilson admits that such a paper was written by him. Whether it was really executed or not, some things are certain about it: First. If executed at all, it was executed to Russell, and never was assigned by him to the company, and the latter never assumed any obligation of any kind on account thereof. Second. It was either a conditional sale or an option to buy, depending solely upon Russell's acceptance, action, and payment, and not upon that of the company. Third. Smith never asked, as a condition precedent to the use of his material, the ratification of this conditional contract, and, so far as known, the president of the

company, at least, never was informed of its existence. Fourth. It conferred no right whatever by its terms to the immediate possession in Russell of these wells and this machinery, no matter how hard counsel may seek to create this impression and argue from such premise. On the contrary, the very sentence relied on in favor of such contention, to the effect that the machinery, etc., was not, during the six months, to be removed from the premises, refutes such contention. It was on Smith's farm, and it was to remain there, unless Russell, within six months, paid for it and thereby became entitled to it and to take it away.

No pretense is made that the production of oil under this option or conditional sale was ever turned over to Russell. On the contrary, Smith held on to that fast and hard. Why was no delivery made or use allowed or to be allowed to Russell of this machinery and material during this six months prior to payment? Was it not because Smith was under obligations, moral ones at least, to allow its use for a fair and reasonable consideration, for the purpose of drilling and developing his property? Had he not written that the cost of drilling a well with new machinery and material throughout would be $6,000, but that by reason of his having on the ground such machinery and material it could be drilled for much less, and that he would lease all or part on reasonable terms, because all he wanted was to have the property developed? Did he not carefully provide for this development in the lease? Why was not this option made a part of the lease itself, if it was to enter into the practical operations of such development, and if notice to assignees of it was expected by him to be taken? He certainly knew that nothing is more common in oil fields than assignment of these leases, and that in a large number of cases the man who takes the leases so assigns and some assignee does the drilling. I cannot regard the existence of this option to Russell alone as any justification for Smith's action in allowing the plaintiff to use his property until April 19, 1906, and then, because of its expiration alone, demanding its forthwith return, at the cost of stopping all their work and losing all their expenditure. Russell's default, in any event, was not its default, and whether this action on Smith's part was justified must be determined on grounds wholly independent of this option; and whether or not it had, in fact, any actual existence, therefore becomes wholly immaterial.

On the same 19th of April when he stopped operations, he wired the company, Bixler, its president, and Russell, to the effect that lease did not give the company right to use his boiler and engine and material, that Russell's option had expired, that he demanded the property or money at once. What was his purpose? Did he want his property? Did he have any use for it? Did he expect to coerce, by such measures, the company into paying him $10,000 for the three comparatively worthless wells and this second-hand material, or did he hope and expect thereby to secure the abandonment and forfeiture of the lease and the material of the company then and there? Bixler, the president of the company, living in Pennsylvania, tried to investigate and find out what the trouble was. He knew nothing about the alleged option, so he wrote Smith several letters asking substantially

for explanations. He got no satisfactory answers. Smith meantime waited one month, and, on May 19th, addressed notices to Russell by mail both to Pittsburgh and Meadville, Pa., and to Bixler, president of the company, notifying them that under the terms of the lease as claimed by him they had but to May 30th, 10 days, to complete the well—a physical impossibility—and, if not completed before that date. the lease would be forfeited, and he would cancel it. These notices to Russell were returned "unclaimed" and "refused." Russell testifies it was not that these notices were refused, but that he was away on vacation. The one to Bixler was directed to him at Meadville, Pa., and it was not received by him at Johnsonburg until June 9th. These notices had been registered and no returns of deliver to either Bixler or Russell had been received by Smith up to June 25th. Nevertheless, he on that day entered into a contract with W. H. Carr to finish the incompleted well for a one-fourth interest, and a few days after, under this arrangement, the plaintiff company's well tools, derrick, and materials were cooly taken possession of, the 400 or 500 feet necessary to complete it were drilled, a small producer obtained, the oil from which was run into Smith's tank, and then Smith proceeded with the drilling of another, apparently, and, so far as appears, having full possession of all the company's property, as well as his own, and this latter became a producing well.

Meanwhile, the company sent its attorney, W. S. Smith, down to Charleston and West Union to ascertain, at the first place, if the charter of the company had been recorded and other legal requirements had been complied with, and, at the latter place, as he states, to settle, if possible, the difficulties between Smith and the company. He testifies that he met and had conversation with Smith's son, which is admitted, and that on his return from the farm to town he met Smith in the road, and had a heated discussion with him, which ended by Smith virtually warning him to keep off his premises. This was in the latter part of July or the first of August. Smith denies this meeting and conversation with the attorney, and he is corroborated by the party who had driven the attorney out to the farm.

I frankly say that, in view of Bixler's testimony that both Smith and his son, subsequently, at Philippi, and on the train going from the hearing held there for the restraining order herein, had admitted such conversation; and, taking into consideration the disingenuous character of Smith's testimony all the way through, his remarkable and unaccountable lapses of memory as to matters that it seems to me any other man could not have forgotten (such as the number of wells drilled on his own farm, the average daily production of the producing wells, and many others), and, on the other hand, his distinct recollection of what it clearly appears he regarded as to his interest in this controversy—taking, I say, all these things into consideration, I believe the attorney told the truth; but, as I have said, I regard the incident as immaterial. This attorney, almost immediately on his return, had to go to a hospital and undergo an amputation of a leg, and for this reason the bringing of this suit was delayed, as claimed, until in January following. Was defendant, under the circumstances, justified in regarding this lease forfeited?

Numerous cases have defined and settled the law touching these oil and gas leases, and, because of the uncertain, indeterminate, and fleeting character of the product sought, have virtually decided them to be sui generis, requiring peculiar rules to govern both their construction, and operations under them. Among these principles, it is held that such a contract is not a grant of land, nor a present leasehold interest therein. It is not a grant of the oil itself, in place, or under, the land, but only the right to search for it. If the search is fruitless, the explorer loses. On the other hand, if the search is successful, the explorer obtains vested right as a tenant the same as in other leasehold estates for the purpose of operating for the oil which his search has discovered. Whether a tenancy, in the true sense, exists, depends, therefore, on whether oil or gas has been actually found or not. Again, the duty and obligation of the tenant or lessee, after oil or gas has been found, depend on the peculiar character of the product. It may be that the same lessee may own the adjoining property or properties, or have more advantageous leases thereon. He cannot be permitted, after drilling a single well upon the first, to move therefrom or cease operations thereon, for the purpose of drilling or suffering to be drilled numerous wells on adjoining lands that will drain the first and give an undue part of the product to the others. He must be diligent and active in development.

To fully enforce these and other duties and obligations of operation and use under this class of instruments has led courts of equity to modify and to a certain extent reverse its well-established rule of abhorrence of forfeitures, so that such forfeiture is favored, when, instead of working a loss or injury contrary to equity, it promotes justice and equity and protects the owner against the indifference, laches, and injurious conduct of the lessee. These and similar principles have been determined by the Supreme Court of Appeals of this state in such cases as Thomas v. Hukill, 34 W. Va. 385, 12 S. E. 522; Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107; Trees v. Eclipse Oil Co., 47 W. Va. 107, 34 S. E. 933; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W. Va. 583, 42 S. E. 655, 59 L. R. A. 566; Lowther Oil Co. v. Guffey, 52 W. Va. 88, 43 S. E. 101; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027. Also, by the Circuit Court of Appeals for this circuit in Foster v. Elk Fork Oil & Gas Co., 32 C. C. A. 560, 90 Fed. 178, and Huggins v. Daley, 40 C. C. A. 12, 99 Fed. 606, 48 L. R. A. 320.

But while these principles have been established for the protection of the landowners from injury and wrong on the part of the lessor, yet it is not for one moment to be thought that they can be invoked to enable the landowner to overreach and defraud the lessee out of his vested rights acquired by assumption of all risk and the expenditure of large sums of money in the search for and production of the products and the finding thereof.

It would certainly be contrary to all equity and good conscience to allow a landowner, after his lessee has spent thousands of dollars in drilling one well and almost another, the one well producing gas, and the other confidently expected to produce either oil or gas, with no cause of complaint for neglect, laches, or purpose to injure, to create,

by his own act and conduct, a forfeiture of all these vested rights within a period of less than 90 days. To constitute an abandonment by the lessee of an oil lease, there must be both an intent to abandon and actual relinquishment of the leased premises. Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027.

Where a lessor leases land for oil and gas purposes, his remedy for failure on part of lessee to further develop the leased premises, or to properly protect the lines thereof from drainage through wells on adjacent property, is ordinarily by action at law for damages, and not by way of forfeiture of the lessee's right to bore or drill for oil. Harness v. Eastern Oil Co., 49 W. Va. 232, 38 S. E. 662; Ammons v. South Penn Oil Co., 47 W. Va. 610, 35 S. E. 1004; South Penn Oil Co. v. Edgell, 48 W. Va. 348, 37 S. E. 596, 86 Am. St. Rep. 43; Core v. New York Petroleum Co., 52 W. Va. 276, 43 S. E. 128; Lowther Oil Co. v. Miller-Sibley Oil Co., 53 W. Va. 501, 44 S. E. 433, 97 Am. St. Rep. 1027.

What possible justification could there be in equity or common honesty of a legal principle that would allow the owner at his will to fix an impossible date for his lessee to complete his well, give notice to this effect which he knows has not been delivered, and allow him then to forfeit the lease and obtain the benefit of thousands of dollars of his lessee's labor?

Then, too, I may say here, in passing, that I do not regard the position taken, that the company held Smith's machinery as a mere licensee, and in consequence he had at any time, and without notice, the right to reclaim it, to be sound. The company was not holding or using it by mere license. A fair consideration of the facts and conditions leads to the inevitable conclusion that this use was one of the very considerations held out to secure the development of the property which was all that Smith expressed himself in his letter as desiring to secure. It was allowed to be used for mutual benefit, under an implied assumpsit to return it and pay for its use, or to pay, for that portion not returned, its fair value. There being an interest coupled with the license to use, to wit, the development of the property, he had no right to reclaim it until at least the completion of the then drilling well, and not then, without fair and full notice of his purpose to do so. This principle is very well stated by my predecessor, Jackson, Judge, in United States v. B. & O. R. R. Co., 24 Fed. Cas. No. 14,510.

It is insisted by the plaintiff that it acquired the right, under the terms of the lease, to the production from the three wells drilled on this farm prior to its execution. This contention is based upon the terms of the lease that gives to the lessee the exclusive right not only to bore for, but to produce, oil on the premises. This proposition might be seriously contended for in cases of ordinary leases which are governed by the rule that the terms of grant are to be construed the stronger in favor of the grantee, but in oil leases, as I have indicated, this rule does not apply, and, if anything, the opposite prevails. It seems to me the terms of grant in this lease must be restricted to the production in futuro from date of lease, and not to that gone before.

In conclusion, it seems clear to me that plaintiff company must be

restored to its rights under this lease; that this cause must be referred to a commissioner to settle the accounts of the receiver and ascertain the compensation due him for his services; that all costs of this receivership, other than the actual sums invested by him in preservation of the wells drilled since the lease, must be paid by Smith, as also all direct damages and costs incurred by plaintiff by reason of its exclusion from the lease; that an account should be stated between the plaintiff company and Smith, charging the former with the fair value of all material and machinery not returned or tendered to be returned to Smith and with a fair compensation for the use of that returned. On the other hand charging Smith with all the gas, if any, sold by him from the gas well, with all the oil received by him, less the one-eighth royalty, from the two oil wells drilled since the lease; and allowing him, as having finished one and drilled the other de son tort, only the actual value of the work so done by him, without any personal compensation for such. And decree may be entered accordingly.